## STATE v. ORVILLE A. BEILKE.

127 N. W. (2d) 516.

April 3, 1964—No. 39,105.

*Lauerman & Willette,* for appellant.

*Walter F. Mondale,* Attorney General, *J. Earl Cudd,* Special Assistant Attorney General, and *William P. Scott,* County Attorney, for respondent.

NELSON, JUSTICE.

Defendant was convicted of the crime of manslaughter in the second degree under Minn. St. 1961, § 619.18(3).[1] He appeals from the subsequent order of the district court denying his alternative motion to set aside the conviction, and dismiss the indictment on which it was based, or to grant him a new trial.

Section 619.18 provided that homicide is manslaughter in the second degree—

"* * * when committed without a design to effect death:

\* \* \* \* \*

"(3) By any act, procurement, or culpable negligence of any person, which, according to the provisions of this chapter, does not constitute the crime of murder in the first or second degree, nor manslaughter in the first degree."

The state's claim is, in the language of the indictment, that on the night of July 1, 1962, at the Township of Moltke, Sibley County, defendant—

"* * * then and there being armed with a dangerous and deadly weapon, to-wit: a rifle, a more particular description of said weapon being to the Grand Jury unknown, said rifle being then and there loaded with gunpowder and a leaden bullet, and said rifle being then and there held in the hand of him, the said Orville A. Beilke, did then and there unlawfully, wrongfully, feloniously, and by culpable negligence, without excuse or justification, without authority of law, but without a design to effect his death, kill a human being, to-wit: one David Beilke, by then and there discharging said rifle at, against, upon and into the body and person of him, the said David Beilke, thereby and therewith inflicting upon the body and person of him, the said David Beilke, a mortal wound, of which said mortal wound the said David Beilke died, in the County of Sibley, Minnesota, on the 1st day of July, 1962."

No eyewitnesses to the occurrence were produced at the trial. The

---

[1] Minn. St. 1961, § 619.18, was repealed by L. 1963, c. 753, art. II, § 17. It was replaced by § 609.205 of that act.

defendant did not take the stand. The evidence presented consists mainly of defendant's out-of-court utterances and certain experiments conducted by David Barron, a weapons expert of the State Bureau of Criminal Apprehension. The state's witnesses included Mr. Barron; Donald L. Miles, an investigator in the employ of the bureau; Donald Schwecke, a neighboring farmer; Ellsworth Wittenberg, a farmer living in the same township as defendant and a constable therein at the time; Herbert Buerkle, the sheriff of Sibley County; Luverne Kamps, the deputy sheriff; and Dr. A. F. Dysterheft, the county coroner. Defendant's mother, Rosetta Beilke, was the only witness called to testify on his behalf.

The following facts appear from the transcript of the testimony taken at the trial: On July 1, 1962, the defendant was living, with his wife and four children, on the farm where the crime is alleged to have occurred. On that evening, while defendant was handling a .22-caliber rifle, it discharged, striking and fatally injuring his 3-month-old son, David Beilke. The child was then lying in a crib which was located against and in the center of the south wall of the living room in defendant's home. The living room is approximately 13½ feet wide and 15 feet long. The bedroom in which defendant customarily slept is to the east of the living room. The bedroom has two doorways, one on its east wall leading outside, and the other on the west wall opening into the living room. The dining room is to the north of the living room. It is connected to the living room by an archway located in the northwest corner of the living room (or the southwest corner of the dining room). As one enters the dining room through the archway there is to the immediate left a door which leads to a staircase landing connecting with the second floor. When this door is opened it swings back into the dining room and toward the south, the hinges being on the south edge of the door.

About 10:30 p. m., July 1, 1962, the defendant telephoned a neighboring farmer, Donald Schwecke, and asked Schwecke to come to his home. The defendant acknowledged to Schwecke that he had "hurt the baby." Schwecke arrived at the defendant's home about 11:15 p. m. with Ellsworth Wittenberg, the township constable. The child was

found in his crib with a gunshot wound in his head. It appeared that he might be alive and Schwecke called a doctor, since defendant said he had not done so.

After Schwecke's arrival other persons were summoned to the Beilke home, among them defendant's mother, a doctor, a minister, and the sheriff. Defendant related to these people an account of what had happened. Defendant said he went to bed at 9:30 p. m.; that subsequently, hearing a noise out in the chicken coop, he went to the landing and picked up the rifle which he kept at the base of the staircase. He said that he had not used the rifle for a month or two, that it was not kept loaded, and that to the best of his knowledge it was not loaded that night. He said that as he proceeded back through the doorway toward the dining room somehow either the rifle or his arm bumped into or struck the door, causing the rifle to discharge. Dr. Dysterheft examined bullet holes in the crib mattress and headboard and a hole in the south wall of the living room. Based on the relative positions of these holes, it appears that the trajectory of the bullet had been 30 to 45 degrees from the floor (the floor being the horizontal base).

The child's body was examined by Dr. Dysterheft and Dr. Bertram F. Woofrey, a pathologist associated with the University of Minnesota. Both stated that death had been caused by a gunshot wound in the head. They also stated that they found powder burns surrounding the point of entry of the bullet to a radius of 2 to 3 centimeters. Mr. Miles, the investigator for the Bureau of Criminal Apprehension, and Dr. Dysterheft testified that in their experience they had never seen a powder burn appear when a .22-caliber rifle had been discharged more than 4 feet from its target. Mr. Barron, the weapons analyst, stated that it is highly improbable that a well-defined powder pattern would result from firing a .22-caliber rifle more than 4 or 5 feet away from a target.

Mr. Miles also examined the Beilke home on July 2, 1962, including the holes in the crib mattress and crib headboard. He also found a bullet lodged in the south wall of the home. He interviewed defendant that day and testified that he told him that it would be impossible for a bullet to have been fired from across the living room, as the de-

fendant described, and leave a powder burn of the type found on the child's head. Miles testified that defendant then said that he had been standing at the west end of the crib and the rifle discharged when it accidentally struck the crib, but that he did not have his finger on the trigger at any time. After relating that he had bumped the rifle on the crib, the defendant, according to Mr. Miles, said that he had "talked too much" and "I don't want to say any more."

Defendant's rifle was tested by Mr. Barron. Barron testified that the rifle was a single-shot, bolt-action type. Its parts were normal as far as the engaging surfaces were concerned. Exerting 3 pounds of pressure on the trigger failed to discharge the rifle, nor did "banging it around" in both a cocked and uncocked position.

Mr. Barron also conducted several firing tests with the defendant's rifle. The spent cartridge found in the Beilke home was identified by Barron as manufactured by either Remington Cartridge Company or Peters Cartridge Company. Using Remington .22 shorts, the rifle was fired in two series of 12 shots each. In one series the target was white blotting paper; in the other series the target was a plastic material backed by foam rubber to simulate the resilience of skin. The shots were made at distances varying from the point where the muzzle of the rifle was in contact with the target to a point 4 feet from it. By comparing the size of the powder pattern found on David's head with the patterns imprinted on the test targets from firings at known distances, an estimate could be made as to the distance from which the fatal shot was fired. Dr. Dysterheft and Mr. Miles each selected three test targets which they believed most resembled the powder burn they observed on David. The patterns selected were firings made at points from 9 to 18 inches from the targets.

No testimony appears in the transcript as to whether defendant, who had already gone to bed, turned on the lights in any part of the home while getting the rifle.

The decisive question raised by this appeal is whether there was sufficient evidence to sustain defendant's conviction. It is a well-established principle that in a criminal case the accused may be convicted only if his guilt is proved beyond a reasonable doubt. In the instant

case the defendant was charged under Minn. St. 1961, § 619.18(3), with killing his son by culpable negligence but without a design to effect death. The question then is whether the state has proved beyond a reasonable doubt that defendant was guilty of such negligence.

The evidence produced at trial against the defendant was circumstantial. In State v. DeZeler, 230 Minn. 39, 52, 41 N. W. (2d) 313, 322, 15 A. L. R. (2d) 1137, 1150, this court recognized that circumstantial evidence is sufficient to support a conviction when the facts disclosed by such circumstantial evidence—

"* * * form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt * * *."

The evidence presented in the instant case does not lead "so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." Admittedly, suspicion has been directed against the defendant here, particularly in view of his inclination to change his statement as to his position at the time of the discharge of the rifle after being told that powder burns would not have been produced if the gun discharged from across the room. "However, circumstantial evidence to justify a conviction must do more than create a suspicion of guilt. It must point unerringly to the accused's guilt." 26 Am. Jur., Homicide, § 456.

The facts adduced are strikingly similar to those in Commonwealth v. Bouvier, 316 Mass. 489, 55 N. E. (2d) 913. In that case the defendant was found guilty of manslaughter by a jury for the reckless and wanton shooting of her husband while he was in bed. The deceased's bedroom was in the southeast corner of the house on the floor above the defendant's bedroom. The doorway to the deceased's bedroom was on the north wall toward the northwest corner. The head of the bed was against the west wall and the distance between the north wall and the left side of the bed was 3½ feet. The deceased had come into the house about 2:30 a. m. and had gone to bed. Thereafter the defendant went up to the second floor to the bathroom. As she was returning

from the bathroom, she saw a shotgun standing in the northwest corner of the deceased's bedroom. The defendant did not think the gun was loaded. Two days before the deceased had checked to see if it was loaded and the defendant had not touched it thereafter. The defendant entered the deceased's bedroom, kicked some clothes away that were on the floor, and picked up the gun. As she began to turn to the left, the gun discharged, striking her husband in the head. The shot was a contact shot. Immediately after the shooting the defendant told several people that she thought her husband had committed suicide. When she talked to the police, however, and when she testified at the trial, she related the above account. On these facts the Supreme Court of Massachusetts set aside a verdict of guilty. It took note of the two types of shooting situations which commonly arise in cases of manslaughter: (1) Where the weapon is intentionally discharged but without intent to injure, and (2) where the weapon is unintentionally discharged due to reckless handling. The court held that the evidence would not warrant a jury finding that defendant intentionally discharged the gun. As to the manner in which the defendant handled the gun, the court said (316 Mass. 495, 55 N. E. [2d] 916):

"* * * While this conduct could have been found properly to have been negligent, it cannot be said rightly to have approached in character the wanton or reckless conduct essential to a finding of involuntary manslaughter, that is, an action on the part of the defendant and circumstances where she should have realized the gravity of danger to the deceased and, notwithstanding, as a result of choice on her part assumed the risk. * * * it cannot be said properly that one of ordinary prudence in acting as the defendant did would realize that there would be a high degree of likelihood that in so doing substantial harm would result to the deceased. The pertinent evidence would not warrant the jury in finding that the defendant knew or ought to have known that the gun was loaded."

As in the Bouvier case, it is clear that the evidence presented here is insufficient to establish that the defendant intentionally fired the rifle. The evidence presented by the state amounted to no more than a

showing that the fatal shot was fired in close proximity to the deceased, that the rifle did not discharge when "banged around" by the state's weapons expert, and that the defendant gave conflicting accounts as to his position in the room when the discharge occurred. Though such evidence may give rise to suspicion, it would not warrant a finding by the jury that the defendant intentionally discharged the rifle. That theory is without support in the evidence and must be eliminated from the case. If the conviction is to stand, it must be sustained on the theory that the defendant did not intend to fire the rifle but is nonetheless guilty of second-degree manslaughter because of the manner in which he handled the weapon.

The only evidence presented at trial as to the manner in which the defendant handled the rifle was the testimony as to defendant's accounts of the incident and the testimony of Mr. Barron. The defendant maintained that his finger was not on the trigger, and the rifle discharged when he "bumped" either his arm or the rifle. Mr. Barron's experiments indicated that the rifle was not likely to have discharged from a simple bumping. On the basis of Mr. Barron's testimony, the state asserts in its brief that the defendant must have handled the rifle in an extremely rough manner. Applying the rule set down in the DeZeler case, the tests conducted by Mr. Barron cannot be accepted as so conclusive as to exclude defendant's claim that the rifle discharged as the result of a mere bumping. The burden of proof is upon the state to establish by legal evidence the guilt of the defendant beyond a reasonable doubt. Without speculating as to the precise way a "bumping" might have caused the discharge of the rifle in this case, suffice it to say that the record leaves too much in the realm of the unknown about the facts of the shooting to require the state's conclusion that the defendant must intentionally have handled the rifle in an extremely rough manner. Either defendant's conviction must be upheld upon a version of the shooting which accepts defendant's claim that a bumping produced the discharge, or it cannot be upheld at all.

The evidence would support a finding that the defendant picked up the rifle without checking to see if it was loaded, carried it within close proximity to the deceased, and then handled the rifle in such a manner

as to cause it to bump the crib. The state contends that these facts support a finding of culpable negligence under § 619.18(3). On almost identical facts, as we have already noted, the Massachusetts court reversed the conviction in the Bouvier case. We are bound to reach the same result on the evidence submitted in this case.

In State v. Bolsinger, 221 Minn. 154, 21 N. W. (2d) 480, this court thoroughly discussed the meaning of culpable negligence. It is more than ordinary negligence. It is more than gross negligence. It is gross negligence coupled with the element of recklessness. It is intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others. The evidence here does not meet that test. The instructions of the trial court, however, did not fully set forth the test of culpability required in a second-degree manslaughter case. There is no evidence to disprove defendant's assertions that the rifle had not been used for a month or two, that he did not keep it loaded, and that to the best of his knowledge it was not loaded when he picked it up just before its discharge. Since he did not know or have reason to know the rifle was loaded, the defendant's conduct, as it appears from the record before this court, cannot be said to have been such that a reasonable or ordinarily prudent man would consider likely to result in injury to another. Perhaps the defendant's failure to check the rifle before advancing with it so close to his son's crib amounted to negligence. But ordinary or even gross negligence is not the negligence required to convict him of the crime charged.

We reach the conclusion that the evidence wholly fails to establish defendant's guilt beyond a reasonable doubt and that the conviction upon the record herein cannot stand.

Reversed and defendant discharged.

MR. JUSTICE SHERAN took no part in the consideration or decision of this case.