## STATE v. RAYMOND J. SWANSON.

240 N. W. 2d 822.

March 19, 1976—No. 45363.

*C. Paul Jones,* State Public Defender, and *Bruce C. Douglas* and *Ronald E. Budd,* Assistant State Public Defenders, for appellant.

*Warren Spannaus,* Attorney General, *Gary W. Flakne,* County Attorney, and *Vernon E. Bergstrom, Michael McGlennen, David W. Larson,* and *Thomas I. Hara,* Assistant County Attorneys, for respondent.

Heard before Kelly, Todd, and MacLaughlin, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

Defendant appeals from a judgment of conviction of second-degree manslaughter and an order denying his post-trial motions. We affirm.

Defendant, Raymond Swanson, a 17-year-old, was certified for adult prosecution and indicted on a charge of first-degree manslaughter [1] in the killing of Terrance Tarver, his mother's fiance.

---

[1] First-degree manslaughter requires intent. Minn. St. 609.20(1) provides: "Whoever does any of the following is guilty of manslaughter

At about midnight on the evening of June 7, 1974, Tarver met his roommate, Jack Nelson, at a bar in Minneapolis where they consumed several drinks over a period of about an hour. Nelson later described Tarver as "kind of hyper" and "kind of drunk" when they proceeded to their residence. Upon arriving there, they discovered an apparent burglary and theft of Nelson's stereo equipment and Tarver's adding machine and typewriter. Nelson reported that Tarver became very angry, immediately accused defendant Swanson of taking the items, and drove off in his truck. At about 1:30 a. m. on the morning of June 8, Tarver telephoned the house of defendant's mother, Barbara McKelvie, and spoke with her, angrily accusing Swanson of the theft and stating that he was coming over.

Tarver arrived at the McKelvie house and proceeded to the kitchen where Mrs. McKelvie was waiting for him. Tarver began yelling and screaming and threatening to "get" Swanson. Swanson came up the basement steps and into the kitchen to face Tarver. Tarver threw Mrs. McKelvie who was between Tarver and Swanson aside and began to advance toward Swanson. Tarver was visibly angry but unarmed. Swanson backed up to the kitchen wall, pulled a .25-caliber pistol from a holster inside his trousers, fumbled in preparing the gun for firing, and fired a shot hitting Tarver, who was 4 or 5 feet away. After the first shot, Tarver continued to move toward Swanson and Swanson fired three more times, killing Tarver. All four bullets hit Tarver in the trunk area, with one bullet passing through the heart. Defendant testified that although he wanted to stop Tarver and intended to shoot him, he did not intend to kill him.

At the close of the evidence, the prosecution requested that

in the first degree and may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $15,000, or both:

"(1) Intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances * * *."

second-degree manslaughter [2] be submitted along with the charged offense of first-degree manslaughter.[3] Defendant objected, contending that he admitted an *intentional* shooting and that the jury must find him guilty of first-degree manslaughter or not guilty by reason of self-defense. The trial court submitted second-degree manslaughter, and the jury returned a verdict of guilty of that offense.

■ Defendant initially argues that the evidence is insufficient to support the verdict. The relevant statute, Minn. St. 609.205 (1), defines manslaughter in the second degree in terms of culpable negligence. In discussing culpable negligence, we have commented:

"In State v. Bolsinger, 221 Minn. 154, 21 N. W. (2d) 480, this court thoroughly discussed the meaning of culpable negligence. It is more than ordinary negligence. It is more than gross negligence. It is gross negligence coupled with the element of recklessness. It is *intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others.*" (Italics supplied.) State v. Beilke, 267 Minn. 526, 534, 127 N. W. 2d 516, 521 (1964).

Defendant testified on cross-examination as follows:

"Q. You said that you took the gun out to see if he would calm down or think, I believe you said. Is that correct?
"A. Yes, sir.
"Q. When you fired, did you intend to shoot him?

---

[2] Minn. St. 609.205(1) provides in relevant part: "Whoever causes the death of another by any of the following means is guilty of manslaughter in the second degree and may be sentenced to imprisonment for not more than seven years or to payment of a fine of not more than $7,000, or both:

"(1) By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another; * * *."

[3] See footnote 1, *supra*.

"A. Yes, sir.

"Q. Or did you intend to scare him?

"A. Well, by the time I had gotten the gun ready for firing, he was too close for me to even attempt to, you know, scare him off or warn, you know, fire a warning shot or anything like that, so I knew I had to stop him.

"Q. Did you mean to kill him?

"A. No, sir.

"Q. Did you aim before you fired?

"A. No, sir.

"Q. Which way did you point the gun?

"A. It was in his direction. It was where he was coming from."

The essence of defendant's argument is that the evidence establishes that he intended to shoot Tarver and did so in self-defense; therefore, he cannot be found negligent but must be found guilty of first-degree manslaughter or not guilty. While the jury could have found that defendant's acts indicated an intent to kill, we think it was not compelled to do so. It could have believed defendant's testimony set forth above that he intended only to stop Tarver and therefore did not take aim but merely shot four times in Tarver's direction and thereby "consciously" took "chances of causing death * * * to another," which under our second-degree manslaughter statute constitutes culpable negligence.

If the jury believed defendant's testimony, it could reasonably have found him culpably negligent in several respects: (1) In entering and remaining in the kitchen armed with a weapon during a heated argument; (2) in pointing the gun in Tarver's direction and firing, thereby consciously taking the chance of killing him even though not intending to do so; (3) in failing to shoot Tarver in the leg or arm or other portion of the body which might have stopped him but not caused fatal injury. If defendant did not intend to kill Tarver, he was culpably negligent in that

he consciously took the chance of causing Tarver's death in allowing his gun to be pointed so that the shots entered the trunk area. Defendant's intentional act of shooting Tarver, while not intending to kill him, is an act which a reasonably prudent man would recognize as involving a strong probability of death to Tarver within the meaning of State v. Beilke, *supra*. See, State v. Spann, 289 Minn. 497, 182 N. W. 2d 873 (1970). The jury therefore reasonably could have convicted defendant of second-degree manslaughter, as it did, because of culpable negligence in consciously taking chances of causing Tarver's death.[4]

Defendant also asserts a number of errors in his trial, two of which merit further discussion. First, he asserts prosecutorial misconduct in withholding evidence material to his guilt or innocence. Second, he asserts error in allowing the prosecution to question him about alleged criminal conduct unrelated to this charge.

Under the well-established rule of Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. ed. 2d 215 (1963), suppression of

---

[4] Defendant also argued that he was denied due process by the submission of second-degree manslaughter. His argument is easily answered by Minn. St. 631.14 which provides: "Upon an indictment for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment, and guilty of any degree inferior thereto; upon an indictment for any offense, the jury may find the defendant not guilty of the commission thereof, and guilty of an attempt to commit the same; upon an indictment for murder, if the jury shall find the defendant not guilty thereof, it may, upon the same indictment, find the defendant guilty of manslaughter in any degree. In all other cases, the defendant may be found guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment."

Manslaughter is an offense consisting of different degrees. Defendant was charged with first-degree manslaughter; he may be convicted of second-degree. Since the evidence supports a conviction for second-degree manslaughter, the trial court properly submitted that offense. State v. Leinweber, 303 Minn. 414, 228 N. W. 2d 120 (1975); State v. Pankratz, 238 Minn. 517, 57 N. W. 2d 635 (1953).

evidence material to guilt or punishment by the prosecution violates due process. As Mr. Justice Douglas wrote for the court:

"The principle of Mooney v. Holohan [294 U. S. 103, 55 S. Ct. 340, 79 L. ed. 791 (1934)] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile,' to use the words of the Court of Appeals. 226 Md., at 427, 174 A. 2d, at 169." 373 U. S. 87, 83 S. Ct. 1197, 10 L. ed. 2d 218.

Defendant alleges that the prosecution withheld information in the form of a statement made by one Gary Lindgren to Lt. Russell Krueger, a Minneapolis Police Department homicide detective, to the effect that one Buddy Wolk had put out a "contract" to kill defendant because defendant had burglarized Wolk's home, stolen cash and a handgun, and pistol-whipped Wolk's step-daughter. While this statement was apparently made to Lt. Krueger some 24 hours before the jury retired, it was not communicated to the prosecutor until approximately 12 p. m. on August 15, 1974, shortly after the jury retired. The prosecutor, in turn, raised the subject of the statement with defense counsel at approximately 2 p. m., when he said, "Ask your client who Buddy Wolk and Gary Lindgren are." Defense counsel apparently did not learn the significance of that request or the exact na-

ture of the statement until after rendition of the verdict, which was received about 5:30 p. m.

Defendant argues that Lindgren's statement was of sufficient materiality to require disclosure under Brady in view of the prosecutor's questioning of defendant concerning his reasons for carrying a gun, and subsequent final argument. Defendant testified on cross-examination as follows:

"Q. You say you carried that gun—when was it that you got beat up?

"A. I think it was about a year, year and a half ago, the last time.

"Q. And you carried that gun to protect yourself so you wouldn't get beat up again?

"A. Yes, sir.

"Q. And you hitchhike, so you carried the gun to protect yourself from people who might give you a ride?

"A. Yes, sir.

"Q. Any other reasons why you carry that gun?

"A. There was supposedly, there was rumors around there were supposedly people that were looking for me to hit me for some, whatever.

"Q. To do what?

"A. To get me. I don't know what they said, beat me up or whatever.

"Q. Who were these people?

"A. I didn't even know.

"Q. Did that concern you?

"A. Yes, sir."

We set forth in full the final argument of the prosecutor regarding this testimony:

"The third thing Judge Kane will tell you is that before you can find the defendant not guilty on the basis that the homicide was justifiable, is that that actual and honest belief the victim was going to kill him or do him very great bodily harm has to

be a reasonable one. It has to be reasonable for the defendant, under the circumstances, to believe that he was in that kind of danger.

"How do we tell? Defendant carried a gun. There is no dispute about that. He had been carrying it for some time. Why did he carry the gun? He carried the gun because he was beaten up a year and a half before, nearly two years, I guess, before this happened, so he was carrying a gun. He was carrying a gun because he was worrying about a homosexual attack when he was hitch-hiking, and the third reason he was carrying a gun is that he is worried some guys are after him. Who is after him? 'I don't know. I heard a rumor some guys were looking for me.' That is why he carried the gun, and that's the point in this case.

"He shouldn't have been carrying the gun. A reasonable person wouldn't be doing that. This defendant, ladies and gentlemen, is a little more—paranoid is such a bad word. He is more worried about physical harm to himself than reasonable people are. A person who is more worried about personal harm to himself doesn't have the right to kill another person just because he happens to feel that way. And that's the point in this case. The defendant was worried about things like 'some people are after me.' 'Who?' 'I don't know.' That sort of thing, worried about being attacked in a car and a beating that happened two years earlier. The defendant thought people were after him. They were going to do him harm. He really believed that, and that's why he carried that gun.

"Well, we have to decide, or you have to decide, whether it was reasonable for him to believe that he was in danger of death and great bodily harm when he shot Terry Tarver. Was he acting reasonably? Or was he acting the way he would act? He is more frightened. He is more concerned. He thinks people are going to do him more harm than they are going to do.

"You have to draw that distinction, whether a reasonable person, reasonable person under these circumstances, when another person, who is practically a member of the family, is yelling and

screaming, does a reasonable person shoot that person actually believing that if he doesn't that he is going to be killed himself? The question is, did he have to kill? Was it necessary to kill in order to preserve himself from sustaining great bodily injury or death? And that's the question."

We are of the opinion that the statement in question was not of sufficient materiality to warrant a new trial here under the rule of Brady.[5] First, that statement does not in any way tend to exculpate the defendant. The fact that there was a rumor of a "contract" involving persons and incidents wholly unrelated to the killing of Tarver is not material in establishing the reasonableness of defendant's conduct *in killing Tarver*, or, therefore, his sole defense of justifiable homicide. Second, the statement was material only to a portion of the prosecutor's argument on reasonableness (ownership of the gun), and then to only one of three pieces of evidence discussed by the prosecutor (rumors of people looking for defendant). Failure to disclose evidence bearing such a tenuous relationship to the issues of intent, negligence, and self-defense does not entitle defendant to a new trial. Third, a comparison of the statement with defendant's testimony reveals no material evidence favoring defendant. Defendant was

---

[5] We do, however, agree with defendant's argument that the police detective must be viewed as a part of the prosecution for purposes of applying the Brady rule. If a prosecutor's response, "I told you as soon as I knew," is accepted to permit police withholding of evidence material to guilt or punishment, police would be encouraged to withhold such evidence from prosecutors until after trial. In order to insure defendant a fair trial, the obligation to disclose must be considered that of the entire "prosecution team." Barbee v. Warden, 331 F. 2d 842 (4 Cir. 1964); Evans v. Kropp, 254 F. Supp. 218 (E. D. Mich. 1966). See, also, United States v. Eley, 335 F. Supp. 353 (N. D. Ga. 1972); Walker v. Bishop, 295 F. Supp. 767 (E. D. Ark. 1967), affirmed, 408 F. 2d 1378 (8 Cir. 1969); Imbler v. Craven, 298 F. Supp. 795 (C. D. Cal. 1969); Nash v. Purdy, 283 F. Supp. 837 (S. D. Fla. 1968); State v. Gills, 239 Md. 458, 212 A. 2d 101 (1965); People v. Yamin, 45 Misc. 2d 407, 257 N. Y. S. 2d 11 (1965).

completely uncertain as to who the people that were allegedly out to "get" him were, or even what they were allegedly going to do to him. The fact that Wolk was rumored to have a "contract" out to kill defendant is not even material to defendant's reasonableness in carrying a gun unless defendant *knew* of the "contract." Neither defendant's testimony nor Lindgren's statement provides any basis for such an inference. Under these circumstances, we hold that the evidence withheld by the prosecution was not sufficiently exculpatory to require a new trial. See, State v. Hyleck, 286 Minn. 126, 175 N. W. 2d 163 (1970).

■ Defendant also alleges error in the following question and response:

"Q. [Prosecutor Brink] * * * Did you have a permit to carry that gun?

"A. No, sir."

"MR. DOUGLAS [defense counsel]: Objection, Your Honor; irrelevant."

The trial court initially overruled the objection, but, after further argument and a brief recess, sustained it, and instructed the jury as follows:

"THE COURT: Well, the last question, ladies and gentlemen of the jury, and the answer, if there was one, will be struck from the record and the jury will disregard them."

Defendant objected only after the answer was in and did not move for a mistrial on this point. While the evidence was irrelevant and possibly harmful in tending to show criminal conduct unrelated to the charge, in view of the trial court's ruling and cautionary instruction, we find any initial error nonprejudicial.

We have considered the other errors asserted by defendant and find them to be without sufficient merit to require further discussion.

Affirmed.