# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1876

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Jesus Torres-Villalobos, also known | * | |
| as Javier Rios-Hernandez, also known | * | |
| as Jesus Mendez-Rios, also known as | * | |
| Jesus Lopez-Torres, also known as | * | Appeal from the United States |
| Jesus T. Villalobos, also known as | * | District Court for the |
| Javier Hernandez-Rios, also known as | * | District of Minnesota. |
| Jose Torres-Mendez, also known as | * | |
| Javier  Perez-Rios, also known as Jesse | * | |
| Torres-Perez, also known as Jesse | * | |
| Torres-Villalobos, also known as Javier | * | |
| Torres-Mendez, also known as Jose | * | |
| Realzola-Perez, also known as Julio | * | |
| Hernandez Royer, also known as Jesus | * | |
| Lopez, also known as Javier Perez, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 17, 2006
Filed:  May 9, 2007 (Corrected: 05/24/2007)

_____

Before SMITH, BOWMAN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Jesus Torres-Villalobos of illegal reentry after deportation, in violation of 8 U.S.C. § 1326. At sentencing, the district court concluded that Torres-Villalobos's prior conviction in Minnesota for second-degree manslaughter was an "aggravated felony," so that the statutory maximum term of imprisonment was twenty years, *see* 8 U.S.C. § 1326(b)(2), and then imposed a term of 92 months' imprisonment. Torres-Villalobos challenges his conviction based on the admission of certain disputed evidence, and he argues that his sentence was imposed in violation of law. We affirm the conviction, but vacate the sentence and remand for further proceedings.

I.

According to evidence presented in the district court, Torres-Villalobos is a Mexican national who was found in a jail in St. Cloud, Minnesota, by immigration authorities in 2005. His criminal history includes a 2001 conviction in Minnesota for second-degree manslaughter, which resulted in his deportation to Mexico in April 2001. After he was deported, Torres-Villalobos returned to the United States, and he was arrested and charged in federal court in Texas with illegally reentering the country after having been deported. He pled guilty in October 2001 and was sentenced to 24 months' imprisonment. Upon release from prison in February 2003, Torres-Villalobos was again deported to Mexico. At some point thereafter, Torres-Villalobos returned to the United States, and in July 2005, he was arrested on a drug charge in Minnesota. After he was found during a routine check of jails by immigration authorities, a federal grand jury charged him with illegal reentry after deportation.

The indictment charged that Torres-Villalobos had been twice previously deported to Mexico, on or about April 12, 2001, and February 5, 2003. The grand jury alleged that these deportations followed Torres-Villalobos's conviction in March 1998 for second-degree manslaughter, which the grand jury alleged was an aggravated felony. The indictment charged that Torres-Villalobos knowingly and unlawfully

entered and was found in the United States in 2005 after this conviction and these two deportations.

At trial, the government introduced documents concerning the prior deportations. The jury returned a verdict of guilty on the illegal reentry charge. At sentencing, the court concluded that the statutory maximum penalty was twenty years' imprisonment, because Torres-Villalobos' prior conviction for second degree manslaughter qualified as an "aggravated felony" for purposes of 8 U.S.C. § 1326(b)(2). The court then imposed a sentence of 92 months' imprisonment, which was the sentence at the bottom of the advisory guideline range.

## II.

### A.

In challenging his conviction, Torres-Villalobos disputes several evidentiary rulings of the district court. We review these decisions for abuse of discretion. *United States v. Seifert*, 445 F.3d 1043, 1045 (8th Cir. 2006).

Torres-Villalobos argues that the district court erred by permitting the government to introduce evidence of two prior deportations – one in April 2001 and another in February 2003 – through documents described as "warrants for deportation." The government was required to prove a prior deportation as an element of the charged offense, but early in the trial, Torres-Villalobos argued that the only deportation that was "properly provable as an element of the crime" was the April 2001 removal. (T. Tr. I at 22). He argues on appeal that the district court erred by admitting evidence of the February 2003 deportation, because it was not relevant to the charged offense and not admissible as a prior bad act under Federal Rule of Evidence 404(b).

-3-

We conclude that evidence of the February 2003 deportation was properly admitted for two reasons. First, it was relevant to proving an element of the charged offense. The government was required to prove a prior deportation, and it could satisfy that element by proving either the April 2001 deportation or the February 2003 deportation. *See United States v. Meza-Villarello*, 602 F.2d 209, 210-11 (9th Cir. 1979) (per curiam). Second, at the conclusion of the evidence, the parties agreed that the jury instructions would specify that the government must establish the prior deportation element by proving the February 2003 deportation. The April 2001 deportation was stricken from the instructions. (T. Tr. II at 64-68, 74). By agreeing that the case would be submitted to the jury based on the allegation that he was previously deported in February 2003, Torres-Villalobos waived any claim that evidence of February 2003 deportation was irrelevant.

Torres-Villalobos also appears to contend on appeal that the district court erred by admitting evidence of his deportation in April 2001. This evidence was received at a point in the trial when Torres-Villalobos maintained that *only* the April 2001 deportation could satisfy the prior deportation element of the offense. The government could rely on the April 2001 deportation to prove an element of the charged offense, so the evidence was clearly relevant. Torres-Villalobos also complains that the district court permitted evidence that he was in the United States as far back as June 1991. That evidence, however, was received in connection with testimony from an immigration agent that Torres-Villalobos made admissions concerning his alienage – another element of the offense – when he was interviewed in June 1991. Therefore, the evidence was relevant and properly admitted. Another evidentiary challenge relates to testimony that Torres-Villalobos was found in a correctional facility in 2005, and that investigators learned of his presence "from a routine check of the jails." The district court did not err in allowing this evidence, because the government was required to prove that Torres-Villalobos was "found" in

-4-

the United States in 2005, (*see* Jury Instruction No. 11, R. Doc. 17, at 14),[1] and the circumstances of his apprehension were relevant to proving that element of the offense.

Torres-Villalobos further complains that the court erred by admitting evidence of a prior conviction for illegal re-entry in Texas in December 2001. The government sought to introduce evidence relating to this prior conviction to prove the defendant's alienage. There was brief testimony from an immigration agent that Torres-Villalobos had been convicted of a "Title 8, United States Code, Section 1326 offense," but the certified record of the conviction was not received in evidence. (T. Tr. I at 80-81). Later, with the agreement of the parties, the court used the record of conviction to take judicial notice that the defendant admitted his legal status was "alien" on December 19, 2001, and there was no further reference to the fact of conviction. (T. Tr. I at 81-82, 122). We find no abuse of discretion in allowing this limited use of the prior conviction to prove an element of the charged offense.

B.

Torres-Villalobos also challenges the admission of warrants of deportation on the ground that they deprived him of the right to "be confronted with the witnesses against him" under the Sixth Amendment. A warrant of deportation is a document that commands an immigration official to take custody of the deportee and to remove him from the United States. *United States v. Garcia*, 452 F.3d 36, 41 (1st Cir. 2006).

---

[1]The governing statute requires only that the government prove that the alien entered, attempted to enter, *or* was found in the United States, 8 U.S.C. § 1326(a), but the government's proposed instructions and the final jury instructions imposed a requirement that the government prove *both* that Torres-Villalobos entered *and* was found in the United States. (R. Doc. 6, at 28; R. Doc. 17, at 14). This heightened requirement thus became the law of the case. *United States v. Staples*, 435 F.3d 860, 866 (8th Cir.), *cert. denied*, 127 S. Ct. 148 (2006).

A signed warrant indicates that the attesting witness observed the deportee leaving the country. As noted, the government introduced the warrants of deportation to prove the element of the charged offense that Torres-Villalobos had been deported in the past. The witness who testified concerning the February 2003 warrant explained that he could not specifically recall seeing Torres-Villalobos cross the border, but that his regular practice was to sign the warrant upon seeing the alien depart the country, and that the records therefore accurately reflected the fact of his observations at the time. (T. Tr. I at 126-31). Because the government could not produce testimony from someone who actually recalled seeing Torres-Villalobos leave the country, Torres-Villalobos argues that admission of the warrant of deportation denied him the right to confront his accuser.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54. Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 126 S. Ct. 2266, 2273 (2006). *Crawford* declined "to spell out a comprehensive definition of 'testimonial,'" 541 U.S. at 68, but gave examples of testimonial statements and historical exceptions to the hearsay rule that permitted receipt of non-testimonial evidence. *Id.* at 51-52, 56. With respect to the latter category, the Court observed that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial – for example, business records or statements in furtherance of a conspiracy." *Id.* at 56; *see also id.* at 76 (Rehnquist, C.J., concurring in judgment) ("[T]he Court's analysis of 'testimony' excludes at least some hearsay exceptions, such as business records and official records."); *United States v. Urqhart*, 469 F.3d 745, 748-49 (8th Cir. 2006) (likening a Certificate of Nonexistence of Record to a business record and holding that it is non-testimonial evidence under *Crawford*).

Torres-Villalobos seeks to extend the rule of *Crawford* to warrants of deportation. He contends that a warrant of deportation does nothing more than testify as to the attesting witness's declaration that the alien was deported on the date in question. Therefore, Torres-Villalobos argues, a warrant of deportation recounts "testimonial" hearsay, such that introduction of the document violates his right to confront his accuser.

Four circuits have addressed this issue, and all have concluded that the attesting witness's declaration is not "testimonial." *See*, *e.g.*, *Garcia*, 452 F.3d at 41-42; *United States v. Valdez-Maltos*, 443 F.3d 910, 911 (5th Cir.) (per curiam), *cert. denied*, 127 S. Ct. 265 (2006); *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1075 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1652 (2006); *United States v. Cantellano*, 430 F.3d 1142, 1145 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 1604 (2006). The Ninth Circuit concluded that a warrant of deportation is not testimonial "because it [is] not made in anticipation of litigation, and because it is simply a routine, objective cataloging of an unambiguous factual matter." *Bahena-Cardenas*, 411 F.3d at 1075. The Eleventh Circuit added that "a warrant of deportation does not implicate adversarial concerns in the same way or to the same degree as testimonial evidence," because it is "recorded routinely and not in preparation for a criminal trial." *United States v. Cantellano*, 430 F.3d at 1145.

Warrants of deportation are produced under circumstances objectively indicating that their primary purpose is to maintain records concerning the movements of aliens and to ensure compliance with orders of deportation, not to prove facts for use in future criminal prosecutions. *See Davis*, 126 S. Ct. at 2273-74. They are properly characterized as non-testimonial official records that were prepared independent of this litigation. *See Crawford*, 541 U.S. at 56; *Urqhart*, 469 F.3d at 748-49. We therefore agree with our sister circuits that the warrants of deportation are not "testimonial" evidence that implicate the Confrontation Clause of the Sixth Amendment.

Torres-Villalobos's claim based on *Crawford* fails as to one warrant for another reason. With respect to the February 2003 warrant of deportation, which documented the prior deportation that satisfied one element of the instant offense, (T. Tr. II at 64-68, 74), he was afforded an opportunity to confront the witness who attested to his departure from the country. The warrant of deportation recounted that Torres-Villalobos's departure was witnessed by Eduardo Benavidez, an immigration enforcement agent. (T. Tr. I at 75). Benavidez testified at trial concerning his completion of the warrant. (*Id*. at 120-33). He was confronted and cross-examined by Torres-Villalobos. Accordingly, even assuming the February 2003 warrant of deportation was testimonial, Torres-Villalobos was able to exercise his Sixth Amendment right to confront the accusing witness. *Crawford*, 541 U.S. at 60 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

III.

In challenging his sentence, Torres-Villalobos maintains that the district court violated his right to a jury trial under the Sixth Amendment by finding that his prior Minnesota conviction for second-degree manslaughter was an "aggravated felony" under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(43)(F), and increasing his statutory maximum sentence on that basis. *See id*. § 1326(b). This argument is foreclosed by *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), and *United States v. Kempis-Bonola*, 287 F.3d 699, 702 (8th Cir. 2002), which are still good law. *See United States v. Booker*, 543 U.S. 220, 244 (2005); *United States v. Lopez-Zepeda*, 466 F.3d 651, 655 (8th Cir. 2006).

Alternatively, assuming the fact and nature of his prior conviction may be decided by the court, Torres-Villalobos disputes the district court's conclusion that his prior second-degree manslaughter conviction is an "aggravated felony." Section 1326(b)(2) provides for a statutory maximum penalty of twenty years when the

offender's prior removal was "subsequent to a conviction for commission of an aggravated felony." 8 U.S.C. § 1326(b)(2). A lesser statutory maximum applies if the defendant was not previously removed after a conviction for an aggravated felony.[2]

In Minnesota, there are five enumerated means of committing manslaughter in the second degree. Minn. Stat. § 609.205. The record does not include a judgment of conviction, charging document, or other similar record showing the subsection under which Torres-Villalobos was convicted.[3] The parties focus primarily on the first subsection, which encompasses a person who causes the death of another by "the person's culpable negligence," whereby the person "creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." *Id.* § 609.205(1). The Minnesota courts have construed "culpable negligence" to mean "gross negligence coupled with the element of recklessness," and "intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." *State v. Beilke*, 127 N.W.2d 516, 521 (Minn. 1964).

_____

[2]In its brief on appeal, the government asserts that "unless second-degree manslaughter in Minnesota qualifies as an aggravated felony under the statute, the maximum statutory penalty would be two years, rather than 20 years." (Br. of Appellee, at 25). In a petition for rehearing, the government contends that the statutory maximum sentence applicable in the absence of an aggravated felony "is ten years rather than two years imprisonment." (Pet. for Reh'g, at 1). Other than to determine whether Torres-Villalobos's conviction for second-degree manslaughter constitutes an aggravated felony, we express no view on the applicable statutory maximum penalty, and we leave that matter for determination in the first instance by the district court on remand.

[3]The presentence report recites that according to "offense materials," on October 9, 1997, a witness observed Torres-Villalobos chasing Elias Solis-Holguin, while Torres-Villalobos said that Solis-Holguin was chasing him. The report states that "[p]olice learned that the defendant stabbed Solis-Holguin with a knife in the chest," and that Torres-Villalobos pled guilty to second-degree manslaughter in January 2001. (PSR ¶ 22).

The INA defines an aggravated felony as a "crime of violence" under 18 U.S.C. § 16 for which the term of imprisonment is at least one year. 8 U.S.C. § 1101(43)(F). The district court concluded that Torres-Villalobos's conviction for second-degree manslaughter in Minnesota was a "crime of violence" under § 16, and thus an "aggravated felony" under § 1326. Based on the statutory definition and the Supreme Court's recent guidance, however, we conclude that the manslaughter offense does not qualify as an "aggravated felony."

Section 16 of Title 18 defines a "crime of violence" as:

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. The language of § 16 "requires us to look to the elements and nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004).

Using the categorical approach, *Leocal* held that offenses that have no *mens rea* component or require only a showing of negligence are not crimes of violence under § 16. *Id.* at 9-10. The Court concluded that for an offense to be a crime of violence under § 16(a), the "active employment" of physical force must be an element of the offense. *Id.* at 9. Because § 16(a) requires the "use" of force, it "most naturally suggests a higher degree of intent than negligent or merely accidental conduct," and it is "much less natural to say that a person actively employs physical force against another person by accident." *Id.* Thus, the offense of causing injury while driving intoxicated was not a crime of violence, because it did not have the "use of force" as an element.

-10-

Though § 16(b) "sweeps more broadly" than § 16(a), it does not thereby "encompass all negligent misconduct." *Id.* at 10. "It simply covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Id.* As with § 16(a), the "use" of force described in § 16(b) requires a risk of "active employment" of force, and not merely "accidental or negligent conduct." *Id.* at 11. Thus, § 16(b) requires a categorical determination of whether the perpetrator of the offense consciously risks that force will be "actively employed" in the course of committing the offense. Applying that subsection, the Supreme Court concluded that a person does not "risk[] having to 'use' physical force against another person in the course of operating a vehicle while intoxicated and causing injury." *Id.*

*Leocal* reserved the question whether a statute requiring "proof of the *reckless* use of force against the person or property of another qualifies as a crime of violence under 18 U.S.C. § 16." *Id.* at 13 (emphasis in original). Nevertheless, the Court's reasoning suggests that crimes requiring only reckless disregard for the risk of physical injury to another are not crimes of violence under § 16. Interpreting *Leocal*, the Third Circuit, in an opinion by then-Judge Alito, "[could not] overlook the Court's repeated statement that 'accidental' conduct (which would seem to include reckless conduct) is not enough to qualify as a crime of violence." *Oyebanji v. Gonzales*, 418 F.3d 260, 264 (3d Cir. 2005). Therefore, the court concluded that a conviction for vehicular homicide, which required proof of reckless conduct, was not a crime of violence under § 16. *Id.* at 265. Similarly, the *en banc* Ninth Circuit recently held that "the reckless use of force is 'accidental' and crimes of recklessness cannot be crimes of violence [under § 16]." *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1130 (9th Cir. 2006) (en banc). Several other circuits have reached similar conclusions, before and after *Leocal*. *See Bejarano-Urrutia v. Gonzales*, 413 F.3d 444, 447 (4th Cir. 2005) (holding that involuntary manslaughter is not a crime of violence under § 16); *Jobson v. Ashcroft*, 326 F.3d 367, 375-76 (2d Cir. 2003) (same); *United States v. Chapa-Garza*, 243 F.3d 921 (5th Cir. 2001) (concluding that intentional use of

force, or recklessness as to possibility of intentional use of force, is required for an offense to be a crime of violence under § 16, and that felony driving while intoxicated does not qualify); *Bazan-Reyes v. INS*, 256 F.3d 600, 609 (7th Cir. 2001) (holding that aliens' prior convictions for drunk driving and homicide by intoxicated use of a motor vehicle were not crimes of violence under § 16, because there was no intentional use of force); *see also Tran v. Gonzales*, 414 F.3d 464, 471 (3d Cir. 2005) (holding that "reckless burning or exploding" was not a crime of violence under § 16, and concluding that "§ 16(b) crimes are those raising a substantial risk that the actor will *intentionally* use force in the furtherance of the offense.") (emphasis in original).[4]

Before *Leocal*, we had concluded that involuntary manslaughter as prescribed by 18 U.S.C. § 1112 was a "crime of violence" under a statute worded identically to § 16(b). *United States v. Moore*, 38 F.3d 977, 981 (8th Cir. 1994) (decided under 18 U.S.C. § 924(c)(3)); *see also Omar v. INS*, 298 F.3d 710, 715-17 (8th Cir. 2002) (holding that criminal vehicular homicide is a crime of violence under § 16). *Moore* relied on *United States v. Springfield*, 829 F.2d 860, 863 (9th Cir. 1987), *see* 38 F.3d at 981, which reasoned that involuntary manslaughter "comes within the intent, if not the precise wording of § 924(c)(3)," because the crime was "highly likely to be the result of violence." *Moore*, 38 F.3d at 979 (quoting *Springfield*). In *Omar*, we relied on *Moore* and held that the use of force required in § 16(b) was satisfied in the

---

[4] Unlike other provisions defining crimes of violence, the "substantial risk" in § 16(b) does not relate to the risk of physical injury that a person's conduct presents. *See Leocal*, 543 U.S. at 10 n.7 (comparing § 16(b) with USSG § 4B1.2); *see also United States v. Hudson*, 414 F.3d 931, 935 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1769 (2006). Instead, § 16(b) deals with offenses that involve ignoring "the risk that *the use of physical force* against another might be required in committing a crime." *Leocal*, 543 U.S. at 10 (emphasis added). Thus, although felony drunk driving can be a "violent felony" under 18 U.S.C. § 924(e)(2)(B)(ii), which requires only that the offense involve "conduct that presents a serious potential risk of physical injury to another," *United States v. McCall*, 439 F.3d 967, 973 (8th Cir. 2006) (en banc), it is not a crime of violence under § 16.

vehicular homicide statute by the "considerable physical force" that a vehicle operated by an impaired driver could exert. *Omar*, 298 F.3d at 717. In contrast to our reasoning in *Moore*, however, *Leocal* focused on the precise wording of § 16 and the elements and nature of the prior conviction. 543 U.S. at 7-9. Because the textual analysis and analytical framework outlined in *Leocal* is inconsistent with our reasoning in *Moore* and *Omar*, we conclude that *Leocal* superceded our prior opinions such that they do not bind us here. *T.L. ex rel. Ingram v. United States*, 443 F.3d 956, 960 (8th Cir. 2006). Indeed, the Supreme Court cited *Omar* as one of the conflicting decisions that led the Court to grant certiorari in *Leocal*. 543 U.S. at 6.

Under Minnesota law, a person can commit second-degree manslaughter without using force or risking the intentional use of force. Minn. Stat. § 609.205. A person can commit this crime by recklessly leaving a child alone with lit candles that later start a fire, *State v. Boyer*, No. C8-01-617, 2001 WL 1491450, at *1 (Minn. Ct. App. Nov. 27, 2001), by allowing a child to die of dehydration while in the person's care, *State v. Williams*, No. A04-1694, 2005 WL 3046328, at *1 (Minn. Ct. App. Nov. 15, 2005), by leaving explosives and blasting caps stored in an automobile where they are later ignited by the use of jumper cables, *State v. Bicek*, 429 N.W.2d 289, 291 (Minn. Ct. App. 1988), and, indeed, by driving drunk with "culpable negligence" in a manner that causes the death of a passenger. *State v. Geary*, 239 N.W. 158, 159-60 (Minn. 1931). As such, the "use of force," as *Leocal* interpreted that phrase, is not an element of a second-degree manslaughter conviction.

Nor does second-degree manslaughter involve a risk that the perpetrator will intentionally use physical force in the course of committing the offense. A perpetrator's knowing disregard of a serious risk of injury, as required by the Minnesota manslaughter statute, is different from a robber or burglar ignoring the risk that he may resort to the intentional use of force in committing the offense. *Cf. Leocal*, 543 U.S. at 10 n.7 ("The risk that an accident may occur when an individual drives while intoxicated is simply not the same thing as the risk that the

individual may 'use' physical force against another in committing the DUI offense."); *see Tran*, 414 F.3d at 471. For these reasons, we conclude that Torres-Villalobos's prior conviction for second-degree manslaughter was not a "crime of violence" under 18 U.S.C. § 16, or an "aggravated felony" under § 1326(b).[5]

The government argues that whether or not second-degree manslaughter is properly considered a crime of violence under § 16(b), a prior judicial determination precludes relitigation of this issue. In 2002, the Fifth Circuit concluded in a non-precedential opinion that Torres-Villalobos's manslaughter conviction was a crime of violence under § 16. *United States v. Torres-Villalobos*, No. 01-51284, 2002 WL 31845159, at *1 (5th Cir. Dec. 3, 2002) (unpublished). Bearing in mind that "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality," *United States v. Hernandez-Uribe*, 515 F.2d 20, 22 (8th Cir. 1975), we do not believe this is an appropriate case for applying the doctrine of collateral estoppel. The Supreme Court's decision in *Leocal* has clarified the law since 2002, and whether the

---

[5]A dissenting judge in the Fourth Circuit expressed the view after *Leocal* that a person acting with the *mens rea* of recklessness can "actively employ" physical force, and thus commit a "crime of violence" under 18 U.S.C. § 16. *Bejarano-Urrutia*, 413 F.3d at 449 (Niemeyer, J., dissenting). Under this view, where an involuntary manslaughter statute "encompasses both active commissions and passive omissions," a court would look to the record of conviction to determine whether the offense involved "physical force," as opposed to a passive omission. *Id*. at 450. Even this minority approach, however, would not support the conclusion that Torres-Villalobos's manslaughter conviction was a crime of violence. The record on appeal does not include a charging document, plea colloquy, or other similar record establishing the basis for the manslaughter conviction. The factual recitation in the presentence report appears to rely on police reports, (PSR ¶ 22), which may not be considered in those circumstances where a court is permitted to look beyond the elements of an "overinclusive" statute. *See McCall*, 439 F.3d at 974.

prior conviction for manslaughter qualifies as an aggravated felony for purposes of the sentence in this case should be determined in accordance with present law.[6]

* * *

For the foregoing reasons, we affirm the judgment of conviction, but vacate the sentence and remand for resentencing consistent with this opinion.

_____

[6]Torres-Villalobos also complains that the district court miscalculated his criminal history score under the advisory guidelines by counting one point for a misdemeanor conviction in which Torres-Villalobos was not represented by counsel. The government concedes error, and we presume the district court will modify its guideline computation accordingly on remand.