STATE of Minnesota, Respondent,

v.

Willie L. HARDIMON, Appellant.

No. 51953.

Supreme Court of Minnesota.

Oct. 2, 1981.

C. Paul Jones, Public Defender and Mark F. Anderson, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Michael McGlennen, Asst. Public Defender, Thomas A. Weist and Anne E. Peek, Minneapolis, for respondent.

SIMONETT, Justice.

Defendant was found guilty by a district court jury of charges of first- and second-degree murder for the March 1, 1980, shooting death of an elderly couple in their south Minneapolis home which was next door to the house in which defendant was residing. The trial court sentenced defendant to consecutive prison terms of life and 40 years. Issues raised by defendant on his appeal from judgment of conviction are (1) whether the evidence was sufficient to prove intent and premeditation, (2) whether the trial court erred in refusing to suppress defendant's confession and other evidence, (3) whether the trial court erred in certain evidentiary rulings relating to the intoxication defense, and (4) whether defendant is entitled to preconviction and presentence jail time as a credit against his prison term. We affirm.

On Sunday afternoon, March 2, 1980, the bodies of James and Gladys Wedlund, ages 72 and 74, were discovered shot to death in the front bedroom of their south Minneapolis residence. Both were seated in chairs they normally used in the living room when watching television. The chair in which Gladys Wedlund was seated had been tipped onto its side. James Wedlund had three bullet wounds, two of which (head and chest) were lethal; the autopsy results suggested he may have been reaching for the barrel of the gun when he was first shot in the chest and that the head wound came after the chest wound. Gladys Wedlund had two wounds, one to her shoulder and one to her head, the latter causing death; it could not be determined which came first.

The combination of a number of pieces of evidence suggested that the shootings had occurred between 8 and 9 p. m. the night before, Saturday, March 1, 1980. Other evidence suggested that the couple had opened the door to someone. That person had taken a number of items of personal property and had moved the television into the porch before leaving.

Investigation caused police to focus their suspicion on defendant, and at 8:40 a. m. on March 15 the police simultaneously executed a number of search warrants, including one at the house of defendant's brother. Defendant was arrested when he answered the door. After waiving his *Miranda* rights, defendant was questioned in the dining room of the house by Detective Richard O'Brien.

Defendant at first denied involvement in the incident but later changed his story and claimed that he and another man had been involved in the burglary of the house but left when they saw two other men come. Detective O'Brien told him that he did not believe him and said that he felt that defendant had executed the two people and he wanted to know why. He also asked defendant if he was religious, and defendant said that he was. Defendant then admitted the shootings: first in a statement to O'Brien, then to another officer who came into the dining room, then en route to the police station, and then in a written statement later in the morning.

The substance of defendant's statements was that he had gotten intoxicated that day, that he had looked through a window at his brother's house into the Wedlunds' house and had seen the Wedlunds' television, that he and his companion had decided to break in and tie up the Wedlunds and steal the television, that he gained entry peacefully, that he first shot Mr. Wedlund when he grabbed at the gun and shot him a

total of three times, and that he shot Mrs. Wedlund because she started screaming and because he did not want her to identify him. He stated that he then dragged the chairs, with the bodies in them, into the bedroom so that no one could see them through the undraped living room windows and he then began ransacking the house. He stated that he then went out and told his companion to get the car and was in the process of moving the television out when he broke the rear protruding part of the set, and he then fled. He admitted selling some of the stolen personal property, specifically two rings and some coins, to a coin and metal dealer in St. Louis Park on March 3.

In his statements on March 15 defendant claimed he had thrown the murder weapon into the river. Later confronted with the fact that a witness he named did not corroborate this, defendant admitted he had lied and he told the police where to find it.

At trial defendant, testifying in his own defense, changed his story again, claiming that he had had no conversation with his companion before he committed the crimes and also claiming that he fired all five shots at once in an automatic way, at both Mr. and Mrs. Wedlund, after Mr. Wedlund tried to grab the gun. He admitted he felt he was doing wrong when he entered the house and he claimed great remorse after the incident. He attributed the shootings to the fact that he had consumed excessive quantities of alcohol and smoked a large number of marijuana cigarettes.

1. Defendant's first contention is that there was insufficient evidence of intent to kill Mr. Wedlund or of premeditated intent to kill Mrs. Wedlund and that both convictions should be reduced to third-degree unintentional felony murder.

■ Generally a person's intent must be determined "from his words (if any) and actions in the light of all the surrounding circumstances." W. LaFave and A. Scott, Criminal Law, at 203 (1972). This is equally true with respect to premeditation, the determination of which must be justified by the totality of the circumstances established by the evidence, giving due deference to the

jury's verdict. *State v. Linder*, 304 N.W.2d 902 (Minn.1981).

■ The best evidence of defendant's intent in this case is what he did. He fired the gun at least five times at fairly close range at two old people who were no physical threat at all to him. That he fired to kill is obvious because the shots were the type of shots likely to kill.

The evidence upholding the jury's determination of premeditation in the killing of Mrs. Wedlund included the following: (a) the fact that there was evidence of prior robbery planning, (b) the fact that defendant must have known there was a possibility that either or both of the victims, whom he knew were home when he entered, might be able to identify him, since he had resided next door to them for at least a month, (c) the fact that defendant armed himself with a deadly weapon, namely a loaded .38 caliber revolver, before he went to the house, (d) the fact that defendant used the weapon even though the victims were old people whose resistance he could easily have overcome without actually firing the gun, (e) the fact that defendant did not just fire the gun once but at least five times, (f) the fact that, according to defendant's statements to the police on the 15th, he shot Mrs. Wedlund because she screamed and because he wanted to prevent her from identifying him, and (g) the fact that he rather calmly remained in the house looking for items to steal after he had killed the victims, conduct which is consistent with his having planned to use the gun. As to the relevance of some of these facts, particularly prior robbery planning and defendant's desire to prevent identification, *see State v. Swain*, 269 N.W.2d 707, 713 (Minn.1978), and *State v. Walker*, 306 Minn. 105, 235 N.W.2d 810 (1975). *See also* Advisory Committee Comment, 40 M.S.A. § 609.18.

2. The second issue is the issue of the voluntariness of the confession defendant made in the house. Defendant argues that the first statement was involuntary and that the subsequent statements and derivative evidence should have been suppressed as the fruit of the poisonous tree.

Contrary to what the state argues in its brief, the issue was preserved.

 In cases in which the claim is made that a confession was involuntary or that the waiver of the *Miranda* rights was involuntary, the trial court must make a subjective factual inquiry into all the circumstances surrounding the giving of the statement. On appeal this court will not reverse any findings of fact unless they are clearly in error, but this court will make an independent determination of voluntariness on the facts as found.

 We agree with the trial court that in this case the facts do not support a determination that any of the confessions was involuntary. Defendant has an eleventh grade education and served in the Marines. The initial interrogation took place in defendant's place of residence and his brother and other relatives were in the next room. It occurred around 9 a. m. Defendant had had a good night's sleep, was not deprived of food and was not intoxicated. Although he had only slacks on, there was no evidence that he felt uncomfortable or that he wanted more clothes on. He stated in his written statement that he had been treated with respect by the police and the evidence bears this out. While Detective O'Brien did use techniques of persuasion—for example, telling defendant when he thought defendant was lying and appealing to defendant's religious belief that one should tell the truth—the techniques were not improper or coercive.

3. Defendant's contention that the trial court erred in refusing to admit certain evidence is a two-part contention.

 (a) First, defendant argues that the trial court improperly prevented him from showing that he was the victim of "post traumatic stress disorder" and Viet Nam War "flashbacks" in an attempt to establish lack of specific intent or premeditation.

Actually, defendant's trial counsel did not raise the issue at trial as it is raised in the brief on appeal. Rather, he simply asked defendant on direct if "in Viet Nam" he saw "any unpleasant activities going on

there?" When the prosecutor objected, a discussion was held in chambers and defense counsel denied he was making any so-called "Rule 20" defense of irresponsibility and stated he was simply going to have defendant relate his intoxication on March 1 to certain similar bouts of intoxication involving heroin he had experienced in Viet Nam and that he agreed Viet Nam itself was irrelevant. The court concluded that Viet Nam had nothing to do with the case and that defendant could testify concerning his intoxication on March 1 without going into his experiences in Viet Nam.

We conclude that the trial court's ruling was within the court's scope of discretion, especially considering defense counsel's failure to demonstrate, by an offer of proof, the relevance of and need for the evidence.

 (b) The other claim is that the trial court erred in refusing to permit defense counsel to call Donald Neuenfeldt, a self-employed alcohol consultant, to have him estimate the blood alcohol level of defendant at the time of the shooting based on a hypothetical and to question him about the physiological effects of alcohol.

The trial court implied that it would allow the testimony if defense counsel could relate it to intent, but defense counsel was unable to satisfy the court that the testimony would relate to intent. On that foundation, the court's ruling is sustained. In so holding, we do not mean to imply that such evidence is generally inadmissible in such a prosecution.

 4. Defendant's final contention is that his preconviction and presentence jail time should be credited against his prison term. It is not clear that this should be an issue in this court, although we agree with defendant that preconviction and presentence jail time should be credited against his prison term. The proper procedure under Minn.R.Crim.P. 27.03, subd. 4(b), is for the sentencing court to "assure that the record accurately reflects all time spent in custody in connection with the offense or behavioral incident for which sentence is imposed, which time shall be automatically

deducted from the sentence." Here the state points out in its brief that a letter of transmittal containing this information is forwarded to the prison when a person is sent to prison. Presumably that was done here.

Affirmed.

WAHL, J., took no part in the consideration or decision of this case.