**STATE of Minnesota, Respondent,**

v.

**Elaine Grace TORKELSON, Appellant.**

**Nos. C0–86–1338, C4–86–1732.**

Court of Appeals of Minnesota.

April 21, 1987.

Review Denied June 25, 1987.

Hubert H. Humphrey III, Atty. Gen., Janet A. Newberg, Sp. Asst. Atty. Gen., St. Paul, Harold Lucking, Swift Co. Atty., Benson, for respondent.

C. Paul Jones, Public Defender, Minneapolis, Donald H. Nichols, Sp. Asst. Public Defender, Minneapolis, for appellant.

Heard, considered and decided by LANSING, P.J., and WOZNIAK and NIERENGARTEN, JJ.

## OPINION

NIERENGARTEN, Judge.

Appellant Elaine Torkelson was convicted of manslaughter in the second degree, Minn.Stat. § 609.205(1) (1984), for contributing to the death of her newborn baby. On appeal she makes claims regarding discovery violations, evidentiary and other rulings by the trial court and contends the evidence was insufficient. We affirm.

## FACTS

Torkelson, an unmarried 19–year-old college student, became pregnant. She successfully concealed her pregnancy, made no meaningful preparation for birth and even refused to see a doctor for any prenatal care.

In her eighth month of pregnancy, Torkelson, while at her parent's home, went to bed around 10:30 p.m. Around 1:00 a.m. she awoke with abdominal pain, went into the bathroom and a few minutes later delivered a baby girl into the toilet. Torkelson testified she then laid on the bathroom floor because she felt faint. Eventually, and it could have been an hour or more later, she looked into the toilet and saw the baby moving.

Torkelson told investigators that she then set the bottom end of a wastepaper basket on top of the baby's head and pushed down with her weight for possibly one minute. Torkelson then put the baby girl into the wastepaper basket upside down, covered her with towels and went back to bed.

The next afternoon, her parents, concerned about Torkelson's appearance, took her to a Willmar hospital where Torkelson told a physician that she might have been pregnant and might have had a miscarriage. After examining her, the physician called the police. Law enforcement personnel went to the Torkelson home that night and noted blood stains in Torkelson's bed and partially cleaned up blood stains in the

bathroom. They were given two blood stained towels by Torkelson's mother.

The following morning, the officers returned to the Torkelson home and Torkelson's mother led the officers to Torkelson's bedroom closet where she showed them a hidden wastepaper basket containing the baby's body, the placenta and two more towels.

Torkelson repeated her story to various investigators and she stated she knew if she left the baby in the toilet it would die and that she did not know if she wanted the baby to die. She added that no one but her third cousin, with whom she had been having a sexual relationship, and his mother knew that she was pregnant.

An autopsy on the baby showed it was a full term infant who was born alive and breathed after delivery but without any evidence of serious trauma, congenital defect, or other cause of death. The pathologist concluded death was caused by asphyxia; drowning or suffocation are forms of asphyxia.

A second autopsy by the Chief Ramsey County Medical Examiner revealed evidence of infection or inflammation in the lungs and at the site of the separation of the umbilical cord. The inflammatory cells were polymorphonuclear leukocytes (PMNs), which take two to eight hours to form in response to an injury trauma or other inflammation-causing agent. The medical examiner also found evidence of trauma inside the baby's head, evidenced by hemorrhages, some of which were not consistent with the birth process. He concluded that the baby probably died from fresh water drowning.

The defense expert witnesses testified to several possible causes of death including, (1) the cause of death was pneumonia, as evidenced by the inflammation in the cord and lungs, (2) that the cause of death was a combination of the birth, head down, into a toilet, pneumonia, and blood loss due to the open umbilical cord (exsanguination) and (3) the baby died of perinatal pneumonia. Several testified that the head injuries were natural birth trauma.

Torkelson was charged with second degree murder and second degree manslaughter. She was convicted of manslaughter in the second degree and sentenced to an executed prison term of 24 months.

## ISSUES

1. Was appellant prejudiced by claimed discovery violations by the State?

2. Did the trial court abuse its discretion in its evidentiary rulings?

3. Was appellant denied a fair trial?

4. Was the evidence sufficient?

## ANALYSIS

### I.

Torkelson asserts the State violated discovery rules as follows:

1. The State withheld evidence that the baby died of pneumonia because the prosecutor met with the Director of Anatomic Pathology at the University of Minnesota Medical School and Hospitals, a possible defense rebuttal expert witness, four days before trial. After the trial started, the Director told the Ramsey County Medical Examiner he thought there was evidence of pneumonia in the lungs. This examiner also knew that the Hennepin County Medical Examiner, a defense witness, believed that there may have been pneumonia present.

After the State rested its case, defense counsel learned that the State had consulted the Director. After talking with the Director, defense counsel told the court that the Director would be a witness and advised that a continuance might be necessary but he never requested one. The Director was called by the defense in rebuttal and testified that he believed the baby died of perinatal pneumonia.

■ The Director's opinion was not exculpatory evidence which should have been turned over to the defense. The evidence consisted of slides showing evidence of inflammation and these slides were provided to defense counsel well before trial. The State provided evidence of the existence of

pneumonia in its case in chief through the Ramsey County Medical Examiner. In addition, it is not certain that the Director's opinion is even discoverable since it is essentially a work product. Minn.R.Crim.P. 9.01, subd. 3(1). Finally, Torkelson was not prejudiced since the evidence was admitted (The Director testified for the defense). *See State v. Smith,* 367 N.W.2d 497, 502 (Minn.1985); *State v. Swenson,* 396 N.W.2d 855, 858 (Minn.Ct.App.1986), *pet. for rev. denied,* (Minn. Feb. 13, 1987).

■ 2. Torkelson next claims she was prejudiced by the State's failure to provide blood test results performed on towels and the wastebasket. However, tests were not able to be completed because of lack of a reagent and the towels and wastebasket were returned to the State.

Further, there was nothing to prevent defense counsel from calling the hospital blood analyst to testify if he sincerely believed there was any exculpatory evidence, or counsel could have had his own expert analyze the materials since he knew as early as the omnibus hearing that blood tests were to be conducted.

■ 3. Torkelson finally claims the State failed to provide microscopic slides of lung tissue prepared during the autopsies. These original slides were provided to defense counsel timely.

Access to additional slides prepared during trial at the State's request was provided defense counsel, even though it's questionable whether the State must disclose this type of rebuttal evidence. *See* Minn.R. Crim.P. 9.01, subd. 1(3). We find no prejudice.

## II.

Torkelson makes a number of contentions regarding evidentiary matters. Rulings on evidentiary matters rest within the sound discretion of the trial court. *State v. Olkon,* 299 N.W.2d 89, 101 (Minn.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).

1. *Relevance.*

■ Torkelson claims the trial court erroneously refused to admit relevant evidence. The record reflects a strict application of the rules of evidence.

a. *Blood covered items of clothing and bedding* —Torkelson's mother, the foundation witness through whom most of these exhibits were offered, testified that she washed most of the exhibits but did not actually know what Torkelson was wearing the night she gave birth. Therefore, any offer of these items as evidence that Torkelson had lost a great amount of blood and was in a weakened condition was of sufficient speculation as to support the exclusionary ruling of the court.

b. *"Big shots" wanted Torkelson arrested* —Torkelson claims she was prejudiced when counsel was not allowed to cross-examine the police chief concerning what he said to Torkelson's family about the reasons for her arrest. Defense counsel believed the chief would say the "big shots" in Kerkhoven wanted Torkelson arrested. The relevance of this type of testimony escapes this court.

We note that some of the excluded evidence appellant claims was relevant was excluded because the trial court correctly determined that proper foundation was not presented.

2. *Cumulative.*

Torkelson claims the trial court erroneously excluded certain evidence which the Director of Laboratory and Clinical Health Director at Children's Hospital would have given. As part of an offer of proof, the Director testified in chambers on her proffered testimony regarding pneumonia and the cause of death.

■ After the Director left the chambers, defense counsel stated that he also wanted her to testify about trauma to the head but did not indicate that that testimony would be different from the already admitted expert defense testimony. Defense counsel also told the court that the Director knows the shock a mother goes through in giving birth but did not make an offer of proof on this point. The trial court

ruled the Director could testify about pneumonia and the cause of death and she did so testify. The offer of proof concerning the head trauma issue and birth shock was untimely and inadequate. The trial court did not abuse its discretion in ruling that any additional testimony on this issue was cumulative under Minn.R.Evid. 403.

Appellants' other claims of erroneous exclusion of evidence as cumulative are without merit.

### 3. *Hearsay.*

We find no abuse of discretion in any of the trial court's hearsay rulings.

### 4. *Torkelson's condition.*

Torkelson claims that the trial court improperly excluded evidence concerning her mental and physical condition at the time of the baby's death. Torkelson argues that because of her intellectual, physical and emotional shortcomings, she should not be held to the same standard in a criminal prosecution as anyone else. Torkelson was precluded from presenting expert testimony that would have indicated that Torkelson has a personality disorder, is extremely quiet, does not handle stress well, is not articulate, and is not very intelligent.

■■■■ Minnesota does not recognize the defense of diminished capacity. *State v. Bouwman,* 328 N.W.2d 703, 706 (Minn. 1982). Torkelson is held to the same standard of care as a reasonable person acting under similar circumstances. Evidence offered that she was not a "reasonable person" was irrelevant and properly excluded under Minn.R.Evid. 403. Torkelson's attempt to gain its admissibility on the grounds the door to such evidence was "opened by" the State in introducing Torkelson's educational background, was properly rejected.

### 5. *Opinion*

Torkelson claims the trial court erred in sustaining several of the prosecutor's objections concerning opinion testimony. We find no error.

### 6. *Exhibit.*

■■■■ Torkelson claims the trial court erred in refusing to allow her to use a mock-up of the Torkelson bathroom in which Torkelson planned to reenact the events that night. Torkelson did reenact the events leading to the death of the baby at trial using the actual toilet from the Torkelson bathroom. That was sufficient.

### 7. *Photographs.*

■■■■ Torkelson claims the trial court refused to allow her to introduce a photograph into evidence on the basis of foundation. After some additional inquiry and bench conferences, the court recessed for lunch and counsel did not reoffer the photograph. Error cannot be predicated when there has been no offer. Minn.R.Evid. 103.

### 8. *Other evidentiary rulings.*

Torkelson cites several "other unusual evidentiary rulings." We find the court's rulings were either proper, not an abuse of discretion or clearly non-prejudicial.

### III.

Torkelson raises a number of claimed errors which allegedly violated her right to a fair trial.

### 1. *Denial of right to explain conduct.*

Torkelson claims that the cumulative result of the trial court's evidentiary rulings denied her due process. We find no constitutional violation.

### 2. *Jurors.*

Torkelson claims one juror should have been dismissed for cause and the trial court showed favoritism in its rulings regarding another venireperson. The record shows no prejudicial misconduct of the court in jury selection.

### 3. *Improper final argument.*

Torkelson claims the prosecutor improperly argued during closing argument by using the definition of negligence as recommended by CRIM.JIG 11.24. Torkelson did

not object to any of the final arguments and this issue has been waived on appeal.

### 4. *Venue.*

Torkelson claims the trial court should have granted a change of venue, apparently because of pretrial publicity. No showing of prejudice was made in this case.

### 5. *Denial of opportunity to make record at omnibus hearing.*

Torkelson claims she should have been allowed to make an offer of proof concerning polygraph tests she took. Polygraph test results are not admissible at trial. *State v. Michaeloff,* 324 N.W.2d 926, 927 (Minn.1982); *State v. Litzau,* 377 N.W.2d 53, 54 (Minn.Ct.App.1985).

### 6. *Statements.*

Torkelson claims that certain unspecified statements were taken in violation of her right to counsel. We find no error. Torkelson's statement, given on November 24, 1985, was not made while in custody and hence not in violation of her *Miranda* rights. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). Further, her statements were not in violation of her right to counsel because no adversarial judicial proceedings had begun. *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977); *Giddings v. State,* 290 N.W.2d 595, 597 (Minn.1980).

### 7. *Other.*

Appellant failed to show that alleged ex parte communication between the court and prosecutor were improper or prejudicial. At the omnibus hearing, the trial court's refusal to allow defense counsel's discovery in the form of a "fishing expedition" was correct. *State v. Rud,* 359 N.W.2d 573, 578 (Minn.1984).

### IV.

Torkelson claims the evidence was insufficient. On appeal the evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume the jury believed the State's witnesses and disbelieved any contrary evidence. *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981).

Torkelson was convicted of manslaughter in the second degree. This statute provides that a person is guilty if he causes the death of another "by his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." Minn.Stat. § 609.205(1) (1984).

The evidence of Torkelson's conduct following the birth of the infant coupled with medical evidence that the baby lived for a period of time and died of asphyxiation, probably due to fresh water drowning support a verdict that Torkelson, by her culpable negligence, created an unreasonable risk and consciously took a chance of causing death.

The State need not prove the specific mechanism of death. The State must prove that Torkelson's acts contributed to the death. *State v. Smith,* 264 Minn. 307, 318–19, 119 N.W.2d 838, 847–48 (1962); *State v. King,* 367 N.W.2d 599, 602 (Minn. Ct.App.1985). The record sustains the conviction.

### DECISION

Appellant's conviction for manslaughter in the second degree is affirmed.

Affirmed.