STATE of Minnesota, Respondent,

v.

Lois Germaine JURGENS, Appellant.

No. C3–87–1165.

Court of Appeals of Minnesota.

May 3, 1988.

Review Denied July 6, 1988.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Ramsey Co. Atty., St. Paul, for respondent.

Douglas W. Thomson, Deborah K. Ellis, Thomson & Ellis, Ltd., St. Paul, for appellant.

Heard, considered, and decided by WOZNIAK, C.J., and CRIPPEN and SCHULTZ,\* JJ.

## OPINION

WOZNIAK, Chief Judge.

This appeal is from a judgment of conviction and sentencing for third degree felony murder, Minn.Stat. § 609.195(2) (1965). We affirm.

## FACTS

Appellant Lois Jurgens was indicted on January 30, 1987 for one count of second degree murder and two counts of third degree murder. *See* Minn.Stat. §§ 609.19 and 609.195(2) (1965). The charges arose out of the death of Dennis Jurgens, Jurgens' adopted son, on April 11, 1965, and the October 1986 change in the death certificate from "deferred" to "homicide." The death certificate, and the coroner's file

---

\* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

generally, were reviewed following inquiries by Dennis Jurgens' biological mother, Jerry Sherwood.

Dennis Jurgens was three-and-one-half years old at the time of his death. He was the Jurgens' second adopted child, and was first placed in the Jurgens home for adoption in December 1962, when he was 14 months old. The Ramsey County Welfare adoption case worker testified Lois Jurgens had concerns about the placement, particularly over how Dennis would relate to their older child, Robert, but that her husband, Harold Jurgens, was very enthusiastic about adopting Dennis. Lois Jurgens was also concerned about Dennis' age, the fact that he was larger than Robert, and some of his other physical characteristics.

A number of witnesses testified concerning Lois Jurgens' physical abuse of Dennis Jurgens. Jurgens' counsel admitted Dennis was an abused child, but contested the extent of the abuse. Much of the testimony came from members of Jurgens' large family, who saw Dennis Jurgens frequently from the time he was adopted. This testimony was impeached by attempts to show bias against Jurgens, and by the witnesses' failure to report the abuse, to testify to it in neglect proceedings in 1965 concerning Robert Jurgens, or to report it to police investigating Dennis' death.

Witnesses testified to incidents of forced feeding, Jurgens' pulling Dennis' ears and lifting him up by the ears, striking him with her hand, tying him to the toilet until he had a bowel movement, and tying him to his crib. Witnesses testified Dennis was frequently bruised, often had black eyes and wore sunglasses apparently to conceal them, and became progressively thinner and more withdrawn. Witnesses testified that Jurgens told them she put a clothespin on Dennis' penis to stop bedwetting. The autopsy showed an injury to the tip of the penis.

In August 1963, Dennis was hospitalized with severe burns on his lower abdomen, genitals and buttocks. Jurgens reported to the physician that the injuries occurred when she was washing Dennis in the sink and he turned on the hot water. The doctor who treated Dennis testified the area of the burn was unusual, and Dr. Solem, a burns specialist, gave his expert opinion how the 1963 injury was inflicted.

Lois Jurgens was at home alone with the children much of the weekend of Dennis' death. Harold told relatives he was going to be out of town the weekend of April 10 and 11, 1965. Harold's testimony in 1965 showed he was in Wisconsin from the evening of Friday, April 9, until 9 or 9:30 p.m. on Saturday, April 10. Jurgens herself told White Bear Lake police her husband had been in northern Wisconsin and she called him on Saturday to tell him Dennis was sick. She said Harold was up with him most of the night.

The state, at the end of its case, presented the testimony of June Bol concerning a statement made to her by Harold Jurgens some eight years after Dennis' death. Jurgens objected to this testimony. June Bol, who had known the Jurgenses since 1947, took into her home in the early 1970's four children the Jurgenses had adopted. She related a conversation with Harold Jurgens, at her kitchen table over coffee, when Harold dropped by after work. According to her testimony:

He said, I was out of town when Dennis died. I was doing some electrical work for some friends. Lois called and said she and Dennis had been at it and I knew what that meant so I put my things together and went right home. When I got home I took Dennis to bed with me and in the middle of the night either he had to go potty or I took him potty and either he said—he said, he said done or he was done and I looked in the pot and there was nothing there, and I took him back to bed with me and in the morning he was dead.

Bol testified at one point that this conversation occurred in 1971, and later said it was 1973. Bol testified that at the time of the conversation she was on good terms with the Jurgenses. Later, she testified, Jurgens had sent her dirty socks and a lead pipe when she had asked for the adopted children's clothes. She had also received

harassing telephone calls which she thought were from Jurgens.

Robert Jurgens testified he woke up in the middle of the night and heard Dennis and his father talking in the bathroom. The next morning, as Lois Jurgens told police, she found Dennis gasping in his crib at 9:30. The doctor was called and pronounced him dead around 10:00 a.m.

Jurgens told both police and the physician that Dennis had fallen the day before and had a cold, running a fever. Robert Jurgens testified he remembered Dennis falling down the basement stairs not long before his death. He testified his mother ran down the stairs after him and started to hit and shake him. He testified Dennis had landed on his stomach at the bottom of the stairs. He also testified Jurgens told him in 1987 the fall down the stairs occurred a week before the death.

The state presented the medical testimony of Dr. Thomas Votel, who was the coroner in 1965; Dr. Robert Woodburn, who performed the autopsy in 1965; Dr. Michael McGee, who is the current Ramsey County medical examiner; and Dr. William Sturner, who is an expert in pediatric forensic pathology. The 1965 autopsy report and morgue photographs were introduced.

Dr. Votel, who viewed the body, testified that he felt Dennis was a battered child, that he was told White Bear Lake police were investigating the death, and that he marked the mode of death on the death certificate as "deferred" to await further information from the investigation.

Dr. Woodburn testified there were from 50 to 100 bruises on Dennis' body at the time of death. He testified there was a linear bruise on the upper abdomen. He identified a perforation of the ileum, or small bowel, as the cause of seepage of gastrointestinal material into the peritoneal cavity, causing peritonitis. He testified the perforation had no internal cause and was, in his opinion, caused by an external force or trauma equivalent to the force generated in a train wreck.

Dr. McGee testified to his exhumation of the body in January 1987. He re-examined the small bowel and reviewed the 1965 autopsy report. Dr. McGee testified the perforation of the ileum was caused by a blunt, traumatic injury occurring from 8 to 48 hours before death. He testified it could not have been caused by a fall down stairs, nor by a fall onto the floor, unless it was from a height of at least six feet onto a fixed, protruding object. Dr. McGee estimated the time of death as 6 to 8 hours before the autopsy was performed at 2:00 p.m. McGee testified it was more probable the trauma was to Dennis' stomach, rather than his back, although McGee acknowledged the trauma could have been to Dennis' back.

Dr. McGee changed the death certificate in October 1986, listing the mode of death as homicide, and the cause of death as peritonitis from the perforation, "due to traumatic injuries consistent with battered child syndrome." These changes were made before the body was exhumed, and McGee conceded he had no evidence other than that available in 1965.

Dr. McGee conceded that battered child syndrome is not a cause of death, but testified the syndrome helps support a finding of homicide. McGee testified the peritonitis would have caused Dennis great pain and it was not possible he had been in the bathroom, talking, shortly before his death. He testified, from 1987 photographs of the Jurgens home, that it was not possible Dennis' internal injuries were caused by a fall down the basement stairs or onto the basement floor.

Dr. Sturner testified the bowel injury occurred 12 to 36 hours before death, was caused by external blunt trauma (most likely to the mid-abdomen), and that, while some of Dennis' bruises could have resulted from the falls described by the parents, the bowel injury could not have occurred in such a manner.

The indictment charged Jurgens with one count of second degree intentional murder and two counts of third degree felony murder (one count charged death occurring in the course of an aggravated assault, the other charged death occurring as a result of the use of a dangerous weapon). The

jury returned a verdict finding Jurgens not guilty of second degree murder and guilty of third degree murder (count not specified). Jurgens had requested an instruction on second degree manslaughter (death resulting from culpable negligence). She objected to omission of this charge when jury instructions were discussed. The trial court declined to submit this lesser offense although Jurgens indicated she would waive the three-year statute of limitations applicable to that offense.

In the second phase of the trial, Jurgens presented two expert witnesses to support her mental illness defense. Dr. Perkins, a clinical psychologist who administered and interpreted various psychological tests, had also tested Jurgens in 1967. Dr. Perkins testified that, in his opinion, Jurgens was suffering from paranoid schizophrenia at the time of Dennis' death. The MMPI test that Perkins gave in 1987, however, showed Jurgens within the normal range, although near the upper limits, on both the paranoia and schizophrenia scales. Also, Jurgens' 1965 MMPI was interpreted as showing no indication of psychotic disturbance. Moreover, the psychologist who examined Jurgens in September 1965 found no signs of mental illness. Even Dr. Perkins, after testing Jurgens in 1967, concluded that he could not say she was mentally disturbed.

Dr. Stephens, a psychiatrist, also gave his opinion that Jurgens was suffering from paranoid schizophrenia in 1965. He testified he believed Jurgens had experienced delusions or hallucinations; however, the only references to such disturbed thinking in the extensive medical records were from the early 1950's. Stephens testified, however, that Jurgens' relationship with Dennis had a delusional quality, particularly in her belief (shared by her husband) that Dennis did not feel pain.

The state presented the expert testimony of Dr. Erickson, the court-appointed psychiatrist, who testified that, in his opinion, Jurgens was not psychotic in April 1965. He testified that even a diagnosis of paranoid schizophrenia would not necessarily mean Jurgens did not know the nature of her act or that it was wrong. The jury found Jurgens was not mentally ill at the time of the offense.

The trial court sentenced Jurgens to an indeterminate sentence, under 1965 law, while expressing the opinion it had the option of sentencing under the guidelines. The court stated there were grounds for departure, and it would have imposed a sentence under the guidelines of at least 15 years. There was no presentence investigation.

## ISSUES

1. Did the trial court err in refusing to dismiss the indictment?

2. Did the court err in not allowing Jurgens to waive the statute of limitations on a lesser-included offense?

3. Did the court err in admitting the hearsay statement?

4. Was the evidence sufficient to support the conviction?

5. Did the court abuse its discretion in sentencing without a presentence investigation?

## ANALYSIS

### 1. Failure to dismiss indictment

Jurgens contends the 22–year pre-indictment delay was a denial of due process and that the prosecution should be estopped from altering its 1965 decision not to bring criminal charges. She also contends the indictment should have been dismissed because it was based on illegal evidence.

#### a. Due process—pre-indictment delay

In order to show a pre-indictment delay violates due process, a defendant must establish

> that the pre-indictment delay * * * caused substantial prejudice to [defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.

*United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971); *see also State v. Hanson,* 285 N.W.2d 487 (Minn.1979).

■ Jurgens has not shown the prosecution intentionally delayed seeking an indictment in order to obtain a tactical advantage. The eventual prosecution unquestionably benefited from the supreme court's recognition of the "battered child syndrome" in *State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973). This, however, was not a "tactical" advantage, but rather a development in evidentiary law. Moreover, there is no indication it was foreseeable in 1965.

It may be difficult for a defendant to show, after 22 years, that prosecutorial delay had a particular motive. However, there was evidence of interference in the 1965 investigation of Dennis' death by Jurgens' brother, White Bear Lake police lieutenant Jerome Zerwas. Jurgens would have to show this interference did not thwart earlier prosecution. On this record, we must conclude the delay in prosecution was not an intentional device to obtain a tactical advantage.

Jurgens' primary claim of prejudice from the delay is in the difficulty it caused her in meeting her burden of showing she was mentally ill at the time of Dennis' death. She did establish that some of her medical records had been lost or destroyed. However, extensive medical records were available, dating back to 1952, and, while they showed numerous hospitalizations for mental disturbance, none established a major mental illness which would satisfy the *M'Naughten* standard. The Minneapolis Clinic records, which Jurgens claims were illegible, were particularly important because Jurgens was examined there in September 1965, only five months after Dennis' death. However, the state's expert witness was able to reconstruct the purportedly illegible portions of the record; they were not helpful to Jurgens' mental illness defense.

A defendant challenging pre-indictment delay must show more than potential prejudice. *Marion*, 404 U.S. at 321–22, 92 S.Ct. at 463–64. Jurgens might have been prejudiced by the delay if the lost medical records conclusively supported her experts' diagnosis that she suffered from paranoid schizophrenia. This, however, is speculative. The voluminous records available did not support that conclusion. We note Dr. Garvey, the psychiatrist who examined Jurgens in 1965, was available, but not called by either side. His 1965 conclusion (he found no signs of mental illness) was not helpful to Jurgens' defense.

Jurgens does not claim significant prejudice in defending the homicide charge itself. The medical testimony showed Dennis' injury could have been caused by a fall from a sufficient height onto a fixed object. Recent photos, introduced to show the basement areas of the Jurgens house, were marked to show subsequent construction. Jurgens does not argue the existence of evidence, which has been lost due to delay, regarding the presence of fixed objects in 1965.

A pre-indictment delay of this magnitude unquestionably affects the ability to defend against criminal charges. *See Stoner v. Graddick*, 751 F.2d 1535, 1544 (11th Cir. 1985) (19–year delay in prosecution was extraordinary, but did not compel a presumption of prejudice). Where the defendant fails to meet the *Marion* burden of showing a due process violation, however, the statute of limitations is the defendant's guarantee against facing stale criminal charges. *Marion*, 404 U.S. at 322–23, 92 S.Ct. at 464–65. The legislature has determined there should be no statute of limitations for murder. Minn.Stat. § 628.26 (1965).

*b. Estoppel*

■ Jurgens contends the murder prosecution should be barred under principles of estoppel. Jurgens' attorney in the 1965 neglect proceedings testified he had the impression the county was not going to prosecute. The assistant county attorney, on the record, stated only that that office was not interested in prosecuting *at the time*. The judge stated the threat of criminal prosecution was past. However, he had no authority to make any promise concerning prosecution.

Jurgens may have relied on the apparent decision not to prosecute her when she agreed to submit to psychiatric evaluation

in the neglect proceeding. There is no indication, however, that she incriminated herself in that examination. We conclude Jurgens has not shown there was a promise not to prosecute, nor that she relied on it to her detriment. *See Northern Petrochemical Co. v. U.S. Fire Insurance Co.,* 277 N.W.2d 408, 410 (Minn.1979).

### c. Inadmissible grand jury evidence

■ Jurgens claims the indictment should have been dismissed because the grand jury had the amended death certificate before it. We disagree. Although the grand jury transcript is not in the record, it is clear from its use at trial that Dr. McGee gave much the same testimony as he gave at trial concerning the cause of death. A death certificate's statement regarding mode of death is generally inadmissible because it is a conclusion and is hearsay. *Hestad v. Pennsylvania Life Insurance Co.,* 295 Minn. 306, 310, 204 N.W.2d 433, 436 (1973). Dr. McGee's live testimony, however, provided the missing foundation and made the written hearsay statement merely cumulative.

### 2. Waiver of statute of limitations for manslaughter

Jurgens claims the court erred in refusing to allow her to waive the statute of limitations so that manslaughter could be submitted as a lesser-included offense.[1]

There is a conflict of authority on whether the statute of limitations is jurisdictional, or a defense which may be waived. *See, e.g., United States v. Wild,* 551 F.2d 418, 422 (D.C.Cir.1977), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2178, 53 L.Ed.2d 226 (holding the limitations can be waived); *see also State v. Tupa,* 194 Minn. 488, 260 N.W. 875 (1935) (discussing whether defendant had waived the statute of limitations). This court has recently held a criminal statute of limitations is not jurisdictional and can be waived by the defendant. *State v. Johnson,* 422 N.W.2d 14 (Minn.Ct.App. 1988).

■ Regardless of the outcome of the statute of limitations issue, however, we conclude the trial court did not err in failing to submit second degree manslaughter as such a charge was not supported by the evidence. *See State v. Leinweber,* 303 Minn. 414, 422, 228 N.W.2d 120, 126 (1975) (lesser-included offense need not be submitted if the evidence would not "reasonably support a conviction of the lesser degree and at the same time * * * a finding of not guilty of the greater offense.").

In 1965, third degree felony murder was committed when the defendant, without intent to cause death, caused death while committing a felony upon the person. Minn.Stat. § 609.195(2) (1965). The predicate felony charged against Jurgens was aggravated assault, requiring that she intentionally inflicted great bodily harm or assaulted Dennis with a dangerous weapon. Minn.Stat. § 609.225, subds. 1 and 2 (1965). Assault, in turn, was defined as an act done "with intent to cause fear in another of immediate bodily harm," or "intentional infliction of bodily harm." Minn. Stat. § 609.22 (1965).

Jurgens requested the submission of second degree manslaughter as a lesser-included offense. This was defined as the defendant's causing the death of another:

(1) By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another;

Minn.Stat. § 609.205(1) (1965). Culpable negligence includes:

intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others.

*State v. Beilke,* 267 Minn. 526, 534, 127 N.W.2d 516, 521 (1964).

The medical expert testimony established that Dennis' death was caused by blunt trauma to the abdomen (or possibly the

---

1. The state argues Jurgens waived this claim by failing to raise it until jury instructions were discussed. This contention is incorrect. Jurgens had sought to dismiss the grand jury indictment for failure to submit a manslaughter charge, which would have required such a waiver.

lower back). The degree of force required was substantial, equivalent to a "train wreck" or an automobile accident. Intent is generally to be inferred from the nature of the act and surrounding circumstances. *State v. Hardimon,* 310 N.W.2d 564, 566 (Minn. 1981).

As the dissent points out, the evidence did not establish how the trauma was inflicted. We cannot agree, however, that the nature of the act was unknown, simply because the exact form of the trauma was not established, if the medical testimony established the trauma was inflicted and of sufficient force to be felonious. Even if Dennis was thrown rather than struck, the height from which he would have to have been thrown or the force involved would be sufficient to establish felonious intent. From the injury to Dennis' small bowel and medical testimony as to the force required to inflict that injury, the jury could have inferred the intent to inflict great bodily harm which the aggravated assault statute required. We conclude, however, the jury could not have found such intent lacking and still find Jurgens guilty of culpably negligent manslaughter.

Culpable negligence may include an element of intentional conduct. *See State v. Swanson,* 307 Minn. 412, 240 N.W.2d 822, 825 (1976) (pointing a gun at another and firing, where death was not intended). The jury, however, must have some reasonable basis for concluding that defendant's conduct, while intentional, was not intended to produce the degree of harm that resulted. In *Swanson,* where the court submitted second degree manslaughter as a lesser-included offense over the defendant's objection, the defendant testified to the facts of the shooting. The jury could have found that, armed with a gun, he entered a room occupied by the victim following a heated argument, pointed the gun and fired in the victim's direction.

Here there was no direct evidence of the blow causing Dennis Jurgens' death, only medical evidence establishing the force of the trauma. While the extent of the injury may not always establish the defendant's intent, evidence of the force of the trauma

inflicted here left no reasonable basis for the jury to find culpable negligence. *Cf. State v. Torkelson,* 404 N.W.2d 352, 357 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. June 25, 1987) (defendant, who left newborn baby in toilet, then stuffed her into a wastebasket, was guilty of culpable negligence manslaughter). There was no evidence of other circumstances that might have indicated Jurgens took the risk of, rather than intended to inflict, great bodily harm. The jury could have found culpable negligence instead of felonious intent only from some theory of diminished responsibility. The doctrine of diminished responsibility, however, was rejected in *State v. Bouwman,* 328 N.W.2d 703, 706 (Minn. 1982).

 We recognize the state has the burden of establishing intent, as with any other element of the offense. However, in a case where the "battered child syndrome" is established, the state need not show the specific circumstances of the injury causing death. *See Loss,* 295 Minn. at 281–82, 204 N.W.2d at 410 (defendant's exclusive control, prior abuse, medical testimony that death was not accidental, and battered child syndrome are sufficient to exclude rational hypothesis of innocence). Although a number of these cases are prosecutions for first degree manslaughter, *see Schleret v. State,* 311 N.W.2d 843 (Minn. 1981), *State v. Goblirsch,* 309 Minn. 401, 246 N.W.2d 12 (Minn. 1976), and *Loss,* we find no indication battered child syndrome cannot be used to help establish felonious intent. *See State v. Durfee,* 322 N.W.2d 778 (Minn. 1982) (battered child syndrome evidence in prosecution for first degree assault, requiring intent to inflict bodily harm).

Jurgens was charged with two counts of third degree felony murder, one requiring intentional infliction of great bodily harm, the other assault with a dangerous weapon. Minn. Stat. § 609.225, subds. 1 and 2. The verdict form does not indicate on which count Jurgens was convicted. This omission, however, does not alter our analysis. Given the evidence of the degree of force involved, we believe the jury could not have

distinguished the intent to inflict great bodily harm from the intent only to inflict bodily harm but with a dangerous weapon. The jury was instructed that the term "dangerous weapon" included an "instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." The jury was instructed hands or feet could be "dangerous weapons." *See State v. Born,* 280 Minn. 306, 159 N.W.2d 283 (1968).

■ Jurgens also contends she sought submission of first degree manslaughter. *See* Minn. Stat. § 609.20(2) (1965) (unintended death in the course of committing a "crime" with such force or violence that death or great bodily harm is reasonably foreseeable). We find no indication Jurgens requested submission of first degree manslaughter at trial and, therefore, she may have waived any challenge to the court's failure to submit it. *State v. Morales,* 324 N.W.2d 374, 376 (Minn.1982). In any event, the supreme court indicated in *State v. Adams,* 295 N.W.2d 527, 533 (Minn.1980), that first degree manslaughter should be submitted only when the underlying crime is a misdemeanor or a crime against property. There is no indication the trauma to Dennis Jurgens was a misdemeanor assault.

### 3. Admission of hearsay

Jurgens contends the court committed reversible error in allowing June Bol to testify concerning a statement Harold Jurgens made to her. This statement, to the effect Lois Jurgens had called her husband the day before Dennis died and told him she had been "at it" again with the boy, was admitted under the "catchall" exception to the hearsay rule. Minn.R.Evid. 804(b)(5). Although this statement was double hearsay, Jurgens has not challenged the hearsay admissibility of Lois Jurgens' statement to her husband.

■ The cases cited by the state do not support the admission of the Bol testimony. In *State v. Ortlepp,* 363 N.W.2d 39, 44 (Minn.1985), the court ruled the prior statement of an available witness admissible within the catchall exception where the witness admitted the statement and it was consistent with the other evidence produced by the state. In *State v. Soukup,* 376 N.W.2d 498, 501 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Dec. 30, 1985), where the hearsay declarant was also available as a witness, the statements were admitted, were repeated in signed written statements to police, and were consistent with the medical testimony. In *State v. Whiteside,* 400 N.W.2d 140, 146 (Minn.Ct. App.1987), *pet. for rev. denied* (Minn. March 18, 1987), the statements were made to a social worker who took notes and had no reason to fabricate. None of those circumstances are present here.

June Bol's testimony was consistent with that of other witnesses only in that it was established, and apparently well known within the Jurgens family, that Harold was out of town much of the weekend that Dennis died. The hearsay statement was not consistent with Harold's testimony in 1965, when he admitted his wife had called but denied she asked him to come home. Moreover, June Bol admitted having difficulties with Lois Jurgens in the intervening years, making it possible she had some motive to fabricate the story at trial. The statement, purportedly made around eight years after Dennis' death and fourteen years before trial, did not have such "circumstantial guarantees of trustworthiness" that it should have been admitted. Minn.R.Evid. 804(b)(5).

■ We conclude, however, that the admission of the hearsay statement was harmless error because the state did not have to produce evidence of the circumstances of the injury to Dennis, given that he fit the "battered child syndrome," and the fact that the medical evidence established that his injury had been inflicted. The state has conceded at oral argument that June Bol's testimony was critical to its case. However, we are not bound by this concession to ignore the plain state of the evidence. *See State v. Warren,* 419 N.W. 2d 795 (Minn.1988).

The jury could have inferred from Dennis' constantly bruised state that he and Lois Jurgens were almost continuously "at it." In any event, from the state of his body at death, they could have inferred very recent abuse of a severe nature. *See Schleret*, 311 N.W.2d at 847 (jury in battered child case had evidence of two recent episodes of injuries). June Bol's testimony did not have substantial probative value, not only because the state established the battered child syndrome, but also because the statement did not establish Lois Jurgens had been "at it" any more severely than in the past, when her abuse had not resulted in any fractures or internal injuries. In short, June Bol's testimony, while dramatic, was not highly probative, and its admission was harmless error. We believe the jury was capable of understanding the extensive medical testimony concerning the nature of Dennis Jurgens' injury and his earlier abuse, and was not substantially influenced by the hearsay statement. *See State v. Loebach*, 310 N.W.2d 58, 64 (Minn. 1981).

*4. Sufficiency of the evidence*

■ The supreme court has held that evidence establishing the battered child syndrome, together with other circumstantial evidence, is sufficient to support a conviction for homicide or assault. The court in *Loss* stated:

> We are of the opinion that the circumstantial evidence at trial established defendant's guilt beyond a reasonable doubt. Defendant's conduct with the decedent prior to the incident in question, his prior displays of temper, his exclusive control over the baby at or near the time the death-causing injuries were sustained, the improbability that decedent could have sustained such multiple injuries as a result of a fall from a height of 2 feet, and competent medical testimony to the effect that death had not been caused by accident are elements which "form a complete chain" leading "directly to the guilt of the accused." No reasonable inference other than guilt exists.

*Loss*, 295 Minn. at 281–82, 204 N.W.2d at 410. The state here established not only

the battered child syndrome, admitted by the defense, but Jurgens' exclusive control, the improbability of an accidental cause, and medical testimony that the death could not have been caused by an accident as described by the Jurgenses. The battered child syndrome does not place on a defendant the burden of presenting evidence of accidental death, but does consider the explanation given by the defendant at the scene.

In final argument, Jurgens contended the state had not proved guilt beyond a reasonable doubt. She argued this burden had not been met because the experts could state only to a "reasonable medical certainty" that Dennis' death was not the result of accidental injury. Where a conviction is based on circumstantial evidence, that evidence must form a complete chain which leads so directly to the guilt of the accused that it excludes any rational hypothesis except guilt. *State v. DeZeler*, 230 Minn. 39, 52, 41 N.W.2d 313, 322 (1950). Much of the evidence showing battered child syndrome and showing the cause of death of such a child is circumstantial. *See Schleret*, 311 N.W.2d at 847. In *Schleret*, the cause of death was a blood clot in the brain. The child was extensively bruised, had a skull fracture, had received two recent injuries, and, according to medical testimony, could not have been fatally injured in the manner described by the stepmother. *Id.* at 846–47. The court concluded:

> Viewing these circumstances surrounding Brian's death, a jury might reasonably conclude that no other rational hypothesis could explain what happened to him except that appellant, having severely beaten him on more than one occasion, finally caused his death.

*Id.* at 847.

The evidence here established not only a history of prior abuse, making Dennis Jurgens a battered child, but also medical evidence of a fatal injury which doctors testified could not have been caused accidentally, as initially described by the Jurgenses. Moreover, Lois Jurgens was in exclusive control of Dennis during much of the time the injury could have been inflicted. There was virtually no evidence of significant

abuse by Harold Jurgens. The evidence was amply sufficient, under *Loss, Schleret,* and similar battered child cases, to support the conviction for second degree murder.

*5. Lack of presentence investigation*

Jurgens' claim that the trial court abused its discretion in failing to order a presentence investigation is without merit.

 Defense counsel requested at the sentencing hearing that Jurgens be sentenced under 1965 law, stating he did not believe "there is any choice in the matter." Jurgens was granted her right of allocution. The statute in 1965 did not mandate a presentence investigation. Minn. Stat. § 609.115, subd. 1 (1965) (court "may" order a presentence investigation). Jurgens did have a right to present mitigating facts and arguments, whether by argument of counsel, allocution at sentencing, or a presentence hearing or investigation. *State ex rel. Napiwoski v. Tahash,* 278 Minn. 56, 58, 153 N.W.2d 138, 140 (1967). The trial court had the benefit of an extensive examination of Jurgens' mental state, which was her primary mitigating factor. *See id.* (PSI not required if extensive examination of defendant was otherwise made). She was allowed her right of allocution, though she did not exercise it. Finally, it appears the court, which felt it had the option to sentence under the guidelines, may have ordered a PSI if defense counsel had not taken the position that she could not be sentenced under current law.

### DECISION

The trial court did not err in refusing to dismiss the indictment. Second degree manslaughter was not required to be submitted as a lesser-included offense. The admission of a hearsay statement was harmless error. The evidence was suffi-cient to support the conviction. The trial court did not abuse its discretion in failing to order a presentence investigation.

Affirmed.

CRIPPEN, J., dissents.

CRIPPEN, Judge, dissenting.

The murder conviction here cannot stand. Without more telling evidence of appellant's intent either to inflict great bodily harm or to assault with a dangerous weapon, she was entitled to have submitted to the jury a lesser included instruction of manslaughter, a crime of homicide founded on an initial intentional act that is not felonious in itself.[1] Although the passing of twenty-two years need not and did not preclude successful prosecution of appellant for feloniously causing the death of her son, the evidence did not permit submitting the case to the jury to determine only whether or not Dennis Jurgens was murdered.

1. The murder accusation.

Although circumstantial evidence may be sufficient to support a conviction, it must so "directly" establish guilt as to exclude any other reasonable inference. *State v. DeZeler,* 230 Minn. 39, 52, 41 N.W.2d 313, 322 (1950). To conclude a jury has made a reasonable decision on evidence, it must appear they gave "due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt." *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

Circumstantial evidence here was barely adequate, if at all, to characterize the act causing the injury as an intentional felony. The medical expert testimony established the degree of the force that caused the

---

**1.** Manslaughter in the second degree involves culpable negligence, intentional conduct not necessarily felonious, whereby the actor "creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." Minn.Stat. § 609.205(1) (1965). We must also decide whether a first degree manslaughter instruction was appropriate here; any possible finding this instruction was waived is inappropriate where the trial court evidently took the erroneous position that lesser-included offenses were barred by the statute of limitations that appellant wished to waive. First degree manslaughter involves an intentional non-felony crime, including simple assault, committed "with such force and violence that death of or great bodily harm to any person was reasonably foreseeable." Minn.Stat. § 609.20(2) (1965); *State v. Adams,* 295 Minn. 527, 533 (Minn.1980).

injury and nature of the harm done that caused the death. According to these experts the injury could have been caused by the child being struck focally with great force or by a fall with considerable force onto a protruding object. If the child was not struck with a weapon or struck with an unusually forceful blow, but the child fell, as the experts allow, how did this come about? Did appellant cause the fall by striking, throwing, tripping or pushing the child? On the evidence available, the jury was left largely to speculate on the nature of the human act which caused the injury. Evidence on the history of appellant's abuse shows cause to anticipate simple assault—there is no evidence of prior felonious blows, and the only suggestion of using weapons is testimony of Robert Jurgens that he and Dennis had been spanked with a wooden spoon or rolling pin or things of that nature. Although the scenario of a serious and unexplained falling injury may reasonably preclude an accident theory, it rationally describes a simple assault in which appellant consciously risked causing death or great bodily harm or used such force that death or great bodily harm was foreseeable. *See* Minn. Stat. §§ 609.-205(1) & 609.20(2) (1965).

The evidence of repeated battering of the child, and the ultimate diagnosis of particular trauma to the child consistent with the battered child syndrome, are together sufficient circumstantial evidence to show death in the course of simple assault such as to establish first or second degree manslaughter based on an intentional act. *See State v. Loss*, 295 Minn. 271, 280, 204 N.W. 2d 404, 410 (1973) (reasonable inference of battering parent, based on battered child syndrome, enough with circumstantial evidence to prove first degree manslaughter); *State v. Goblirsch*, 309 Minn. 401, 405–07, 246 N.W.2d 12, 14–15 (1976) (nonaccidental injuries, defendant's exclusive control over child, other circumstantial evidence support inference of first degree manslaughter); *Schleret v. State*, 311 N.W.2d 843, 848 (Minn. 1981) (in view of majority of court, nonaccidental injuries, defendant's exclusive control over child, and battered child syndrome sufficient to prove first degree manslaughter); *cf. State v. Loebach*, 310 N.W.2d 58, 62–64 (Minn. 1981) (overwhelming evidence of murder even without battered child syndrome evidence where four month old child suffered severe harm to his head and body, due to blows or total squeezing the body, occurring at least three times over a period of several weeks).[2] It is quite another thing, however, to contend there is proof of third degree murder in the course of a felony where there is no evidence of an underlying intentional infliction of great bodily harm.

Evidence great bodily harm was suffered is not evidence of intent to cause the same.[3] The series of battered child syndrome cases beginning with *Loss* have affirmed the principle that circumstantial proof of manslaughter can be inferred from the evidence present here: evidence of an assault and the presence of the battering syndrome, along with defendant's exclusive control. *Loss*, 295 Minn. at 280, 204 N.W. 2d at 410; *Schleret*, 311 N.W.2d at 848; *Goblirsch*, 309 Minn. at 405–07, 246 N.W. 2d at 14–15. The cases have never created a hypothesis of murder from the same evidence without evidence the assault was aggravated or committed with intent to cause great bodily harm.[4]

2. There is evidence here that Dennis Jurgens suffered severe burns two years before he was fatally injured. Although there is evidence this injury was inflicted, no evidence was available to characterize the act causing the injury.

3. As the majority observes, intent is generally to be inferred from the *nature of the act* and surrounding circumstances. *State v. Hardimon*, 310 N.W.2d 564, 566 (Minn. 1981). It is quite another thing to infer a particular intent where the nature of the act is unknown.

4. Unexplainably, the trial court permitted the jury to find third degree murder without finding which of two third degree murder counts was proven. Thus, we do not know whether the jury found an underlying felony assault (1) with intent to inflict great bodily harm or (2) without that intent but with a dangerous weapon. A decision based on use of a dangerous weapon is flawed as much as one founded on an intentional infliction of great harm—there is no evidence a weapon was employed by appellant to hurt the child; in fact, there is no evidence appellant's abuse of the child had ever involved use of a

Respondent faults the defense for failing to produce evidence of a theory explaining Dennis Jurgen's injuries and death through events other than murder by appellant. The majority likewise cites the absence of evidence proving other than felonious assault of the child. It is improper, however, to place the burden of proof on the defense on a topic not covered by evidence for the state. Moreover, evidence on a history of abuse is compatible with the theory of an underlying simple assault. Critically, as the majority observes, there is no other evidence here as to the nature of the act that fatally harmed the child. If it has done so at all, the state has barely met its burden in a murder prosecution to show an underlying felonious assault.

2. A manslaughter instruction.

Grave injustice may be done by convicting a person of murder without an opportunity to have an important alternative accusation presented to the jury. In this case, the trial court did not address the question whether the evidence required a manslaughter instruction, evidently concluding instead that appellant could not waive the statute of limitations on manslaughter. As the majority indicates, the court's view on waiver of the statute is in conflict with the rationale and holding in *State v. Johnson*, 422 N.W.2d 14 (Minn.Ct.App.1988); *see also State v. Tupa*, 194 Minn. 488, 260 N.W. 875 (1935) (by discussing whether defendant waived statute of limitations, the court implied it was a waivable defense).[5] Therefore, we are called upon to independently determine whether a manslaughter instruction was mandated.

As the Minnesota Supreme Court has made evident for cases where a defendant has not deliberately, consciously killed another person, a rational decision on whether evidence shows manslaughter or third degree murder requires a careful depiction of the underlying misconduct that leads finally to death. *State v. Adams*, 295 N.W.2d 527, 533. Here, the circumstantial evidence on appellant's underlying criminal act mandates consideration of a lesser included homicide of manslaughter.

The trial court is required to submit a manslaughter instruction if the evidence

> would reasonably support a conviction of the lesser degree and at the same time is such that a finding of not guilty of the greater offense would be justified.

*State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975). The United States Supreme Court reasons:

> [A] defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.

*Keeble v. United States*, 412 U.S. 205, 212–13, 93 S.Ct. 1993, 1997–98, 36 L.Ed.2d 844 (1973) (emphasis in original).

Under *Leinweber*, lesser instructions on manslaughter are required where the jury could rationally conclude that the defendant's conduct, although intentional, was not felonious. *See, e.g., State v. Swanson*, 307

---

dangerous weapon. Moreover, the confusing verdict also leaves open the possibility that the jury speculated on a dangerous weapon and specifically found the absence of an intent to inflict great harm, a finding that emphatically supports consideration of a manslaughter offense. *See State v. Swanson*, 307 Minn. 412, 416, 240 N.W.2d 822, 825 (1976).

5. It should be kept in mind that we are not dealing here with any suggestion that appellant was zealously over-charged, that the trial court arbitrarily submitted to the jury only murder accusations, or that the prosecution unreasonably resisted submission of lesser included accusations. At the time of trial, the parties did not

have the benefit of the holding in *State v. Johnson*, and they could not be confident defendant could legitimately waive the statute of limitations. Because there was room at the time for reasonable differences on the waiver issue, the prosecution could understandably fear obtaining a manslaughter verdict which would be found barred by the statute of limitations. Given the state of the law at the time, a singular effort to compare the evidence with prospective charges was understandably contaminated by the limitations concern; this was a major consequence of the time lapse between the offense and the time of prosecution.

Minn. 412, 416, 240 N.W.2d 822, 825 (1976) (jury could have found defendant culpably negligent where defendant pointed and fired gun at victim who was advancing at him).

In this case, we do not know how the injury was inflicted. The child could have been assaulted with an instrument or other great force directed to his abdomen, or the child could have been injured from a fall set in motion by a simple assault. Appellant had not previously inflicted felonious blows on the child. Appellant's felonious intent is not established from these facts; they permit a rational conclusion by the jury that appellant committed an intentional wrongdoing constituting first or second degree manslaughter.

A permissible inference of guilt arises from the factors in *Loss:* the defendant's exclusive control over the child, a pattern of prior abuse, and nonaccidental cause of death. *Loss*, 295 Minn. at 280, 204 N.W.2d at 410. However, the inferences *Loss* recognizes have never been said to exclude the rational hypothesis of recklessness.

Given these facts, the jury had good reason to acquit appellant of third degree murder and a rational basis for convicting her of manslaughter. It was error to submit the case to the jury without a manslaughter instruction.

3. Conclusion

Appellant does not seriously question that the state has convincingly proven her criminal conduct associated with the death of her son 23 years ago. Given the history of senseless injuries to the child, the conviction of his mother has the ring of truth. Appellant is nevertheless entitled to a fair trial. She legitimately contends that a fair trial was contingent on submitting to the jury the question whether appellant's conduct constituted manslaughter.

For these reasons, appellant is entitled to a new trial, and I respectfully dissent.